[No. 47936–4.   En Banc.   May 27, 1982.]

MARIE MEISEL, *Appellant*, v. M & N MODERN
HYDRAULIC PRESS COMPANY, ET AL,
*Respondents.*

*Alan L. Froelich* (of *Wendells, Froelich, Power & Lakefish*), for appellant.

*Betts, Patterson & Mines, P.S.,* by *Michael Mines* and *Kenneth S. McEwan,* for respondents.

UTTER, J.—Appellant Meisel makes a products liability claim presenting questions of corporation successor liability and corporate disregard. We reject both of her theories of liability as applied to this case and affirm the trial court's order of summary judgment.

M & N Modern Hydraulic Press Company (M & N) was incorporated in 1955 by Nicholas Brodsky, Sr., who was its president until his death in 1974. He also personally owned the land, buildings and equipment which were leased to M & N for its manufacturing activities.

When Nicholas Brodsky, Sr., died in 1974, his son, Nicholas, Jr., inherited the land, the buildings and the equipment as well as 99 of the 100 total shares of M & N stock. In June 1976, Nicholas, Jr., transferred 83 shares of his inherited stock to M & N in satisfaction of an estate debt to the corporation. The following month, Brodsky transferred his remaining 16 shares to his mother for a house, divesting himself of any ownership interest in M & N. Anna Brodsky, Nicholas' mother, became the sole owner of M & N and the manager of operations. Nicholas, in May 1976, incorporated Modern Hydraulic Corporation (Modern), and became sole officer and shareholder. He terminated M & N's lease and evicted it from the property. He then leased the equipment, the buildings and the land to Modern, and commenced manufacturing a custom line of

hydraulic presses.

Anna Brodsky continued as sole officer and shareholder of M & N, which ceased manufacturing upon termination of its lease but continued to service its machines and collect accounts receivable. M & N was dissolved in 1979. On March 19, 1979, Marie Meisel, an employee of Cosmopolitan Diecast of Seattle was operating a trim press in the course of her employment when it amputated her left hand. Cosmopolitan had purchased the press from M & N in early 1976 through a Los Angeles machinery broker. She then brought this products liability suit against M & N, Modern, Nicholas and Anna. Since M & N was dissolved soon after commencement of suit, it became an insolvent defendant. The trial court granted summary judgment to defendants Modern, Nicholas and Anna. Meisel appeals the order of summary judgment as to Modern.

I

Meisel characterizes Modern as the successor corporation of M & N. Generally speaking, a purchasing corporation does not assume the liabilities of its predecessor unless (a) the purchaser expressly or impliedly agrees to assume liability; (b) the purchase is a de facto consolidation or merger; (c) the purchaser is a mere continuation of the seller; or (d) the transfer of assets is for the fraudulent purpose of escaping liability. *See* 15 W. Fletcher, *Private Corporations* §§ 7118–7123 (rev. ed. 1973). Meisel urges us to follow a "new trend" in the law by reading the above traditional exceptions to the rule broadly or by adopting an independent theory of successor liability in a products liability context such as that enunciated in *Ray v. Alad Corp.,* 19 Cal. 3d 22, 560 P.2d 3, 136 Cal. Rptr. 574 (1977). Because we reject Meisel's initial characterization, we decline the opportunity to follow in this case the trend Meisel identifies.

Meisel cites a number of cases in which courts have found successor liability under the "de facto" merger and "mere continuation" exceptions, *supra,* by focusing on the

successor's assumption of the predecessor's enterprise and its capacity to assume the risk of spreading the loss. *See, e.g., Knapp v. North Am. Rockwell Corp.,* 506 F.2d 361 (3d Cir. 1974), *cert. denied,* 421 U.S. 965, 44 L. Ed. 2d 452, 95 S. Ct. 1955 (1975); *Cyr v. B. Offen & Co.,* 501 F.2d 1145 (1st Cir. 1974); *Turner v. Bituminous Cas. Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976). Certainly, if continuity and risk spreading were dispositive, summary judgment would be inappropriate in this case.

While arguing the above cases were correctly decided, Meisel concedes they demonstrate the framework of the corporate rules is "ill–suited to reconcile the competing interests in a products liability action". Note, *Postdissolution Product Claims and the Emerging Rule of Successor Liability,* 64 Va. L. Rev. 861, 879 (1978). Meisel thus encourages us to adopt the successor liability rule of *Ray v. Alad Corp., supra,* which is not analytically subordinate to the traditional corporate rules and their exceptions.

The *Ray* court confronted a sale of assets to which none of the exceptions to corporate successor nonliability applied. Like the courts that had construed broadly the exceptions to the corporate rules, the *Ray* court refused to be bound by the form and circumstances of acquisition, but it also refused to manipulate the traditional exceptions to reach a just result. Rather, the *Ray* court began its analysis by discussing the public policies underlying products liability. These public policies are: "the protection of otherwise defenseless victims of manufacturing defects and the *spreading throughout society* of the cost of compensating them.'" *Ray,* at 31, quoting *Price v. Shell Oil Co.,* 2 Cal. 3d 245, 251, 466 P.2d 722, 85 Cal. Rptr. 178 (1970). Keeping these purposes in mind, the court articulated three justifications for successor liability:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk–spreading role, and (3) the fairness of requiring the successor to

assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

*Id.* at 31. Ostensibly, these justifications apply to Meisel's case.

With respect to *Ray's* first justification, we may assume for summary judgment purposes that Meisel has no other remedy than that against Modern. With respect to *Ray's* second justification, Modern's ability to assume M & N's risk–spreading role is certainly a factual question since it is in the same business and can anticipate like risks. And as to the third justification, "fairness", the similarity of M & N's and Modern's name and product (Modern manufactures a custom line while M & N manufactured a standard line), and Modern's purported assumption of M & N's goodwill (the Los Angeles machinery broker thought the company had only undergone a name change) present factual questions.

■ While all the above factual issues are incompatible with summary judgment, we can only reach them by ignoring an essential prerequisite to the entire inquiry: the transfer of assets from M & N to Modern.

Neither of Meisel's successor liability theories is feasible unless Modern is in fact a successor. Every case cited by Meisel for the proposition that successor liability is applicable to this case involved the transfer of assets in one form or another from corporation A to corporation B. *See Knapp, supra; Cyr, supra; Turner, supra; Tucker v. Paxson Mach. Co.,* 645 F.2d 620 (8th Cir. 1981); *Gee v. Tenneco, Inc.,* 615 F.2d 857 (9th Cir. 1980); *Jacobs v. Lakewood Aircraft Servs., Inc.,* 512 F. Supp. 176 (E.D. Pa. 1981); *Trimper v. Bruno–Sherman Corp.,* 436 F. Supp. 349 (E.D. Mich. 1977); *Dawejko v. Jorgensen Steel Co.,* 290 Pa. Super. 15, 434 A.2d 106 (1981); *Department of Transp. v. PSC Resources, Inc.,* 175 N.J. Super. 447, 419 A.2d 1151 (1980); *Berman v. Watergate W., Inc.,* 391 A.2d 1351 (D.C. 1978); *Powers v. Baker–Perkins, Inc.,* 92 Mich. App. 645,

285 N.W.2d 402 (1979); *Haney v. Bendix Corp.,* 88 Mich. App. 747, 279 N.W.2d 544 (1979); *Bernard v. Kee Mfg. Co.,* 394 So. 2d 552 (Fla. Dist. Ct. App. 1981); *Kinsler v. Rohm Tool Corp.,* 386 So. 2d 1280 (Fla. Dist. Ct. App. 1980); *Andrews v. John E. Smith's Sons Co.,* 369 So. 2d 781 (Ala. 1979); *People ex rel. Donahue v. Perkins & Will Architects, Inc.,* 90 Ill. App. 3d 349, 413 N.E.2d 29 (1980).

The *Ray* court refused to be bound by the form of acquisition, but at the very least, it ruled an acquisition must have occurred. The *Ray* court makes this explicit in its holding:

> We therefore conclude that a party which *acquires* a manufacturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired.

(Italics ours.) 19 Cal. 3d at 34.

The relationship established by a transfer of assets is an important limitation on the breadth of *Ray*'s analysis. It frames discussion of *Ray*'s three justifications within a relatively narrow set of circumstances, those in which one corporation transfers its assets to another corporation. In effect, the *Ray* court imposed an expectation upon acquiring corporations that continue the product line of their predecessors. One of the factors such acquiring corporations must consider is the assumption of the acquired corporation's liabilities. Where no acquisition exists, it is difficult to attach such an expectation. The transaction itself is fundamental to the fairness of the *Ray* approach; otherwise imposition of such an expectation on another firm would be gratuitous. However beneficial the *Ray* approach may be, Meisel's argument is not moored to the merits of such an approach. Since Meisel's argument fails whether or not we adopt *Ray*'s analysis, we need not reach that question.[1]

---

[1]The successor liability rule of *Ray v. Alad Corp.,* 19 Cal. 3d 22, 560 P.2d 3, 136 Cal. Rptr. 574 (1977), may well be salutary, and it would not be inconsistent with this court's prior holdings to adopt it. *See, e.g., Shaffer v. Victoria Station,*

Because of the policy implications discussed above, we will not impute a "de facto" transfer of assets from M & N to Modern simply because some of *Ray*'s justifications may apply to her case. This flaw in Meisel's argument exists whether she argues we should adopt *Ray*'s successor liability theory or we should find she fits within one of the exceptions to the rules of corporate nonliability.

Modern is simply not a successor corporation. Brodsky divested himself of ownership of M & N and began a new corporation—Modern. *None* of M & N's assets was transferred to Modern. True, Modern used the same land, buildings, and equipment that M & N used, but those were not M & N's assets; they were Brodsky's personal property. Summary judgment is affirmed as to Meisel's successor liability claim.

## II

Meisel concedes Modern is not a successor corporation, but attempts to integrate a theory of corporate disregard with her successor liability claim as if to invigorate her successor liability claim. While the results of successor liability and corporate disregard theories are often the same, the inquiries are conceptually distinct. *See* Harris, *Washington's Doctrine of Corporate Disregard,* 56 Wash. L. Rev. 253, 253 n.3 (1981); 1 W. Fletcher, *Private Corporations* § 48, at 276 (rev. ed. 1974).

■ Meisel urges us to disregard the two corporate entities and hold the single enterprise subject to suit. In *Morgan v. Burks,* 93 Wn.2d 580, 585, 611 P.2d 751 (1980), we stated the doctrine of corporate disregard:

> The corporate entity is disregarded and liability assessed against shareholders in the corporation when the corporation has been intentionally used to violate or evade a duty owed to another.

*Inc.,* 91 Wn.2d 295, 588 P.2d 233 (1978); *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 542 P.2d 774 (1975). The new products liability laws, RCW 7.72.010 *et seq.,* do not speak to the question of successor liability, and would not, on their face, foreclose our adoption of such a rule. Nonetheless, this is not the case to adopt such a rule.

This statement of the doctrine identifies two essential factors. First, the corporate form must be intentionally used to violate or evade a duty; second, disregard must be "necessary and required to prevent unjustified loss to the injured party." *Id.* at 587. *See also* Harris, *supra* at 258.

With regard to the first element, the court must find an abuse of the corporate form. See examples catalogued in Harris, *supra* at 260 n.38 and 1 W. Fletcher, *supra,* §§ 41.2, 41.3. *See also* factors catalogued in Krendl & Krendl, *Piercing the Corporate Veil: Focusing the Inquiry,* 55 Den. L.J. 1 (1978). As the Court of Appeals in *Truckweld Equip. Co. v. Olson,* 26 Wn. App. 638, 645, 618 P.2d 1017 (1980) stated, such abuse typically involves "fraud, misrepresentation, or some form of manipulation of the corporation to the stockholder's benefit and creditor's detriment." The doctrine can be understood as a judicial expansion of the principles of fraudulent conveyance law to circumstances in which that doctrine could not apply. *See* Clark, *The Duties of the Corporate Debtor to Its Creditors,* 90 Harv. L. Rev. 505 (1977).

With regard to the second element, wrongful corporate activities must actually harm the party seeking relief so that disregard is necessary. Intentional misconduct must be the cause of the harm that is avoided by disregard. *Morgan v. Burks, supra;* Harris, *supra* at 261.

Applying these elements to this case, Meisel admits she cannot prove the activities of the Brodskys and the two corporations were an attempt to defraud her. She mentions that Anna Brodsky used Modern's facilities in running M & N; she mentions the lease arrangement with Nicholas; and she questions Nicholas' motives in transferring his remaining shares in M & N to his mother. But she does not claim that any of these activities was an attempt to defraud her. She admits they were legitimate but contends they created a fraud in the result.

Here again we are confronted with an argument that attempts to work backwards. Undoubtedly, Meisel was harmed by the dissolution of M & N, but harm alone does

not create corporate misconduct. Separate corporate entities should not be disregarded solely because one cannot meet its obligations. *Morgan,* at 582. The absence of an adequate remedy alone does not establish corporate misconduct. The purpose of a corporation is to limit liability. Unless we are willing to say fulfilling that purpose is misconduct, Meisel is hard put to argue a theory of corporate disregard.

■ Even if we were to assume the existence of corporate misconduct, we would still have difficulty reaching Modern on a theory of corporate disregard. If corporate misconduct were assumed, responsibility would have to lie with Anna or Nicholas Brodsky. Both of them have been dismissed from the suit without appeal, however. Modern is yet another step removed from M & N. Only if Meisel demonstrated Modern's domination or control over M & N, could a corporate disregard theory be maintained. She presents no facts by which such a theory could be given legal cognizance. While Modern arguably inherited some of M & N's goodwill, that is not the same as to say the two corporations were intended to function as one. *See J.I. Case Credit Corp. v. Stark,* 64 Wn.2d 470, 392 P.2d 215 (1964); *McCurdy v. Spokane W. Power & Traction Co.,* 174 Wash. 470, 496, 24 P.2d 1075 (1933).

The trial court's order of summary judgment with regard to Meisel's theory of corporate disregard is also affirmed.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, DOLLIVER, WILLIAMS, DORE, DIMMICK, and PEARSON, JJ., concur.