43 Wn. App. 729 (1986)
719 P.2d 176
ALTA LONG, ET AL, Appellants,
v.
HOME HEALTH SERVICES OF PUGET SOUND, INC., Defendant, HILLHAVEN HOME HEALTH SERVICES, Respondent.
No. 14787-1-I.
The Court of Appeals of Washington, Division One.
May 19, 1986.
James Byron Holcomb, Siqueland & Holcomb, and Richard John Wotipka, for appellants.
James Robert Heller and McGavick, Heller, Pressentin & Dubitzky, for respondent.
RINGOLD, J.
The plaintiffs, Alta Long and members of her class, appeal from a summary judgment in favor of Hillhaven Home Health Services of Washington, Inc. The basic issue presented for our consideration is whether a successor corporation is liable for back pay owing to the employees of the predecessor corporation. We hold that liability may not be imposed on the successor in this case and affirm the summary judgment dismissing the action.
Home Health Services of Puget Sound was a nonprofit corporation that provided health services to ill or disabled persons in their homes. It was organized by Gary Hagen who served as its president and director. Bonnie Jones, Hagen's wife, was also a director and its secretary-treasurer. In 1981, Home Health employed approximately 500 nurses who provided home care to a well established group of patients.
In September of that year, Home Health was in financial distress. Hagen realized that he needed to find a buyer or go out of business. He contacted several potential buyers *731 including the Hillhaven Corporation (the Parent Corporation) in an attempt to find a buyer. By October, Home Health was unable to meet its payroll. Hagen and the president of the Parent Corporation, Mark Havel, were aware of this. On October 16, 1981, Havel agreed to purchase the assets effective 11:59 p.m. that night. Hillhaven Home Health Services was incorporated the next day as a wholly owned subsidiary of the Parent Corporation.
The purchase agreement required Hillhaven to pay Home Health $70,100. Home Health retained its accounts receivable and its bank account. The agreement also provided that:
No Liabilities Assumed. Hillhaven does not hereby and shall not assume any liabilities or obligations of HHS [Home Health Services] of any nature whatsoever, other than obligations under leases assumed by Hillhaven which accrue after the date of Closing.
At the time the sale was closed, Home Health was in default on a number of obligations to various creditors including its employees. Home Health's employees were notified of the purchase agreement in a memorandum from Hagen dated October 19, 1981.
Hillhaven continued to provide the same patient care services Home Health had provided. The Home Health employees who stayed with Hillhaven maintained the same wage levels and pension benefits they had acquired under Home Health. Effective October 19, 1981, Hillhaven employed Hagen as its regional director. Hagen did not acquire any interests in Hillhaven nor was he ever a director or officer of the corporation.
On November 30, 1981, Alta Long and Linda Patrick filed this action on behalf of Home Health's employees seeking recovery of unpaid wages. Hillhaven, Home Health and Hagen were named as defendants. The plaintiff class was later certified pursuant to CR 23(c). Home Health defaulted and on September 16, 1982, judgment was entered against it for $264,385.10. Hagen and his wife filed a federal bankruptcy action seeking to discharge their personal *732 debts. They apparently had no funds or other assets that Home Health's former employees could reach. Their personal debts were discharged in July 1983.
Thereafter, the plaintiffs and Hillhaven filed cross motions for summary judgment. The trial court held that Hillhaven was not liable for Home Health's debt to the plaintiff employees as a matter of law and granted Hillhaven's motion for summary judgment. Plaintiffs appeal.
HILLHAVEN'S LIABILITY AS A SUCCESSOR CORPORATION
The general rule in Washington is that a corporation purchasing the assets of another corporation does not, by reason of the purchase of assets, become liable for the debts and liabilities of the selling corporation, except where: (1) the purchaser expressly or impliedly agrees to assume liability; (2) the purchase is a de facto merger or consolidation; (3) the purchaser is a mere continuation of the seller; or (4) the transfer of assets is for the fraudulent purpose of escaping liability. Martin v. Abbott Labs., 102 Wn.2d 581, 609, 689 P.2d 368 (1984); Meisel v. M & N Modern Hydraulic Press Co., 97 Wn.2d 403, 405, 645 P.2d 689 (1982); Cashar v. Redford, 28 Wn. App. 394, 396, 624 P.2d 194 (1981). The basis of this traditional corporate law doctrine is that a sale of corporate assets transfers an interest separable from the corporate entity and does not result in a transfer of unbargained-for liabilities from the seller to the purchaser.
Hall v. Armstrong Cork, Inc., 103 Wn.2d 258, 261-62, 692 P.2d 787 (1984).
The plaintiffs contend that Hillhaven may be held liable for their unpaid back wages under three of the exceptions delineated.

(a) Implied Assumption of Liability
On October 19, 1981, shortly after Hillhaven acquired Home Health, employment applications were distributed to all former Home Health employees. Along with the application was a memorandum from Hagen which stated in pertinent part:

*733 BUSINESS ACQUISITION
 Hillhaven has acquired the operating business and is responsible for its obligations beginning Saturday, October 17, 1981. All obligations prior to October 17 remain the responsibility of Home Health Services of Puget Sound Inc.
EMPLOYMENT
 Please complete the payroll hire form attached to your check and return it to your Patient Care Coordinator today. This form will recognize you as an employee of Hillhaven effective Saturday, October 17, 1981.
PAYROLLS
 The pay check you are receiving today has been paid by Home Health Services of Puget Sound Inc. out of the purchase price received from Hillhaven for the business, and covers the pay period 9/16 through 9/30 (scheduled distribution date 10/8).
 Home Health Services of Puget Sound is responsible for the Pay period 10/1 through 10/16. I do not expect this payroll to be distributed on 10/23, however I will continue to explore every opportunity to make this money available to you as soon as possible.
 In anticipation of this, Hillhaven will make its first payroll for hours worked from October 17 through October 22 available to you on October 26.
 Subsequent payrolls will be paid bi-weekly with pay periods ending on Thursday, and checks distributed on the following Monday. The first full two week payroll will be distributed on 11/9 covering the period worked 10/23 through 11/5.
Plaintiffs admit that Hillhaven made no formal agreement with them to pay their back wages. They contend, however, that the memorandum of October 19 was equivocal as to whether Hillhaven would assume the obligations. They argue that Hillhaven impliedly agreed to assume the liability for the unpaid wages. The gravamen of their argument is the content of two memoranda distributed to employees after the acquisition.
The first signed by Hagen and dated October 29, 1981, states in pertinent part:
I've met extensively over the past couple of weeks with Mr. Havel and other Hillhaven representatives to work *734 out a smooth transition. I've represented your interests with Hillhaven management. I'm very pleased to report that they have been receptive to retaining the integrity of our personnel policies and benefit package.
The second memorandum informed the employees of the impact the acquisition would have on their benefit package. It stated in pertinent part:
Do I start as though a new employee ... What becomes of my seniority?
Your hire date with Home Health Services of Puget Sound is your hire date with Hillhaven for seniority purposes. We honor all your past service.
Plaintiffs contend that the equivocal nature of the October 19 memorandum coupled with the language in the two subsequent memoranda and Hillhaven's eventual assumption of liability for sick pay and vacation benefits accrued prior to acquisition clearly evidences an issue of material fact as to whether Hillhaven assumed liability for the unpaid wages. Accordingly, they maintain that summary judgment was inappropriate.
[1] As stated in 15 W. Fletcher, Private Corporations § 7124 (1983):
[I]n order that a promise may be implied, on the part of a corporation, to pay the debts of another corporation, to the property and franchises of which it has succeeded by a valid purchase, the conduct or representations relied upon must show such an intention. The presence of such an intention depends on the facts and circumstances of each case. One of the factors to be considered is the effect of the transfer upon creditors of the predecessor corporation. Admissions of liability on the part of officers or other spokesmen of the successor corporation are also considered in determining whether implied liability exists. However, the mere fact that the new corporation has voluntarily paid some of the debts of the old corporation is no ground for inferring that it assumed the latter's debts . ..
(Footnotes omitted.)
Hillhaven's voluntary payment of sick pay and vacation benefits accrued prior to acquisition is not sufficient in *735 itself to imply an assumption of liability for back pay. The question then is whether this voluntary action coupled with the aforementioned memoranda may give rise to an implied assumption of liability making dismissal on summary judgment inappropriate.
[2] When reviewing a summary judgment, the appellate court engages in the same inquiry as the trial court. Hartley v. State, 103 Wn.2d 768, 774, 698 P.2d 77 (1985). Summary judgment is only appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Hartley, at 774. This court is mindful that when determining whether a genuine issue exists as to any material fact, "[t]he court must consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party." Wilson v. Steinbach, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). Nonetheless, summary judgment is appropriate where reasonable persons could reach but one conclusion from those facts and inferences. Hartley, at 775; Davis v. Niagara Mach. Co., 90 Wn.2d 342, 348, 581 P.2d 1344 (1978).
After reviewing the documents at issue in their entirety along with the actions of Hillhaven, we conclude that summary judgment on the issue of implied assumption of liability was appropriate. Viewing the documents and actions in context, reasonable persons could reach but one conclusion. Hillhaven did not impliedly assume liability for unpaid back wages.

(b) Continuation of Seller
[3] In Cashar v. Redford, 28 Wn. App. 394, 624 P.2d 194 (1981), the court delineated two factors to be considered when determining if a successor corporation is a mere "continuation" of its predecessor. "One crucial factor in a `continuation' is a common identity of the officers, directors, and stockholders in the selling and purchasing companies." Cashar, at 397. In the case sub judice, none of the officers, directors, or stockholders of Home Health became *736 officers, directors or stockholders of Hillhaven. Although Home Health's president and executive director, Hagen, was later employed by Hillhaven, there was no "common identity" between the managements of the two corporations.[1]
"Another factor in a `continuation' is the sufficiency of the consideration running to the seller corporation in light of the assets being sold." Cashar, at 397. There is no indication in the record nor do plaintiffs appear to allege that Home Health assets were sold for an unfairly low price.
[4] Despite the plaintiffs' inability to satisfy the continuation test set forth in Cashar, they contend that the continuation exception should be broadened in these circumstances to protect employees. In support of this argument, plaintiffs first urge this court to adopt the doctrine of "remedial successorship" as articulated in Golden State Bottling Co. v. NLRB, 414 U.S. 168, 38 L.Ed.2d 388, 94 S.Ct. 414 (1973). 15 W. Fletcher, Private Corporations § 7124.50 (Supp. 1985). The theory behind the doctrine is
that the strong public policy against any type of discrimination based on race, religion, color, sex, physical handicap, national origin or ancestry mandates relief for the discriminatee even though such relief may be at the expense of a totally innocent party who had no part in the original acts of discrimination. The doctrine has been applied in federal labor relations and Title VII discrimination violations when the original employer is no longer available to respond in damages and the original business has been replaced by another entity conducting the same or a similar enterprise.
Kansas Comm'n on Civil Rights v. Service Envelope Co., 233 Kan. 20, 23, 660 P.2d 549, 552-53 (1983).
Plaintiffs cite numerous federal cases, but no state cases that have adopted the doctrine. Accordingly, we must assume that after diligent search, they have found none. Malstrom v. Kalland, 62 Wn.2d 732, 733, 384 P.2d 613 *737 (1963). Independent research has revealed only one state case that has even considered adoption of the doctrine, and in that case the court declined. Kansas Comm'n on Civil Rights, 660 P.2d at 553.
Next, the plaintiffs argue that strong social policy militates toward protecting employees and insuring that they receive their lawful wages. Plaintiffs cite three cases to support this argument.[2] None of the cases advocate an expansion of the continuation exception. Each case falls squarely within an already recognized exception.
Notably, after the filing of the parties' briefs, our Supreme Court decided Martin v. Abbott Laboratories, 102 Wn.2d 581, 689 P.2d 368 (1984). The court considered whether the mere continuation exception should be expanded in the tort liability context. The court refused to do so and instead found it more "appropriate to retain the traditional corporate exceptions for their intended purposes and adopt[ed] the product-line exception specifically formulated for products liability claims." Martin, at 616; see also Hall v. Armstrong Cork, Inc., 103 Wn.2d 258, 263, 692 P.2d 787 (1984). Accordingly, this court likewise refuses to expand the "mere continuation" exception.

(c) Fraud
A successor corporation may be liable for the obligations of its predecessor if the transfer of assets is for the fraudulent purpose of escaping liability. Hall, at 262. Plaintiffs argue that the memoranda from Hagen and statements made by Hagen and an official from Hillhaven at an administrative hearing constituted fraud and, therefore, the fraud exception applies.
[W]here a corporation receives in good faith a transfer of the assets of another corporation, and pays the latter full consideration therefor, the transfer is not fraudulent, and *738 in such case the creditors cannot hold the purchasing corporation for the obligations of the other, nor can they have the transfer set aside, or the property subjected to their claims. The fact that the purchasing company knew that the selling company was insolvent does not necessarily render the purchase fraudulent, so as to make the purchaser liable for the debts of the seller.
(Footnotes omitted.) 15 W. Fletcher, Private Corporations § 7125 (1983).
Nothing in the record supports an inference that the sale of Home Health was not in good faith and for full consideration. Plaintiffs do not appear to contend otherwise.[3] The fraud exception, therefore, is inapplicable here.

CORPORATE DISREGARD
[5] In Meisel v. M & N Modern Hydraulic Press Co., 97 Wn.2d 403, 645 P.2d 689 (1982), the court stated the doctrine of corporate disregard as follows:
The corporate entity is disregarded and liability assessed against shareholders in the corporation when the corporation has been intentionally used to violate or evade a duty owed to another.
Meisel, at 409 (quoting Morgan v. Burks, 93 Wn.2d 580, 585, 611 P.2d 751 (1980)). The court then identified the two essential factors. "First, the corporate form must be intentionally used to violate or evade a duty ..." Meisel, at 410. *739 In this regard, the court must find an abuse of the corporate form.
such abuse typically involves "fraud, misrepresentation, or some form of manipulation of the corporation to the stockholder's benefit and creditor's detriment." The doctrine can be understood as a judicial expansion of the principles of fraudulent conveyance law to circumstances in which that doctrine could not apply.
Meisel, at 410.
"[S]econd, disregard must be `necessary and required to prevent unjustified loss to the injured party.'" Meisel, at 410. The party seeking relief must be actually harmed by the wrongful corporate activities and the corporation's misconduct must be intentional. Meisel, at 410.
Separate corporate entities should not be disregarded solely because one cannot meet its obligations. The absence of an adequate remedy alone does not establish corporate misconduct.
(Citation omitted.) Meisel, at 411. It is evident that plaintiffs in the case sub judice would be unable to sustain a claim on this theory as explicated in Meisel.
Plaintiffs, however, urge this court to adopt a more flexible approach to the doctrine when claims by employees are involved. They cite Thornton v. Interstate Sec. Co., 35 Wn. App. 19, 666 P.2d 370 (1983) for support. In Thornton, the court considered whether a successor corporation could be held liable for the remainder of a contract that an employee had with the predecessor corporation. Thornton, at 25. Relying on J.I. Case Credit Corp. v. Stark, 64 Wn.2d 470, 392 P.2d 215 (1964), the court held it could.
In reviewing the reasons for disregarding corporate form, the court in J.I. Case Credit Corp. stated that
the thrust of analysis should not be whether "the elements of sameness" predominate, but whether there is "such a commingling of property rights or interests as to render it apparent that they are intended to function as one, and, further, to regard them as separate would aid the consummation of a fraud or wrong upon others."
Thornton, at 26 (quoting J.I. Case Credit Corp., at 475).
*740 The court in Thornton noted that both the predecessor and successor corporations were wholly owned subsidiaries of the same parent corporation. Thornton, at 21. Accordingly, under the J.I. Case Credit Corp. analysis, the court held that the successor should be held liable on the employee's contract.
Notably, the Thornton court makes only passing reference to Meisel and does not consider the two factors discussed therein. It is unclear how the Thornton holding squares with Meisel. It is, however, evident that the court's ruling was strongly influenced by the fact that both of the corporations at issue were wholly owned subsidiaries of the same parent corporation. Thornton, at 27. This fact distinguishes Thornton from the case sub judice. Accordingly, the Thornton analysis is inapplicable.
For the reasons stated, we affirm.
SCHOLFIELD, C.J., and WEBSTER, J., concur.
Review denied by Supreme Court September 2, 1986.
NOTES
[1] The fact that Hillhaven acquired Home Health's "Certificate of Need" and continued to provide the same services is insufficient by itself to establish "common identity".
[2] Jackson v. Diamond T. Trucking Co., 100 N.J. Super. 186, 241 A.2d 471 (1968); Culinary Workers, Local 596 Trust v. Gateway Cafe, Inc., 91 Wn.2d 353, 588 P.2d 1334 (1979); State ex rel. Christensen v. Nugget Coal Co., 60 Wyo. 51, 144 P.2d 944 (1944).
[3] The parties do disagree as to whether the $70,100 paid for Home Health was allocated to pay the employee back wages. Plaintiffs contend that no accounting or bank documentation is available to indicate exactly what happened to the $70,100. We do not consider this contention for two reasons. First, Hagen's use of the acquisition proceeds has no bearing upon whether Hillhaven paid full consideration in good faith. Second, in a deposition Hagen testified that:

"the cash sum for the operating assets of the  of Home Health Services was in the amount of $70,100 and I applied that entire amount to payroll to the staff. And for the record, I am advised by the IRS that I incurred a substantial personal tax liability by doing that so everything I received I applied to payroll for the staff."
Though plaintiffs have made bald assertions to the contrary, they have not brought forth any evidence that controverts Hagen's position. Mere allegations in the pleadings not supported by evidence are insufficient to avoid summary judgment. Twelker v. Shannon & Wilson, Inc., 88 Wn.2d 473, 479, 564 P.2d 1131 (1977); Key v. Cascade Packing, Inc., 19 Wn. App. 579, 582, 576 P.2d 929 (1978).