FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
2018 OCT 29 AM 11: 18

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JOHN BABBITT,<br><br>Respondent/Cross-Appellant,<br><br>v.<br><br>KINGSGATE RIDGE MANOR ASSOCIATION OF APARTMENT OWNERS, a Washington Corporation,<br><br>Appellant/Cross-Respondent. | No. 76555-8-I<br><br>DIVISION ONE |
| KINGSGATE RIDGE, a Washington Corporation,<br><br>Appellant/Cross-Respondent,<br><br>v.<br><br>TTI CONSTRUCTION, INC., a Washington Corporation,<br><br>Respondent/Cross-Appellant. | UNPUBLISHED OPINION<br><br><br><br><br><br>FILED: October 29, 2018 |

CHUN, J. — Over the course of several years, John Babbitt and his corporation, TTI Construction, Inc., performed construction work for Kingsgate Ridge Manor Association (KRM). When KRM encountered financial trouble, it requested a loan from Babbitt. KRM also needed replacement of a deteriorating retaining wall and asked TTI to bid on the project. The parties agreed to and executed both a promissory note memorializing the loan and a contract for TTI's construction of the wall.

KRM defaulted on repayment of the loan and Babbitt sued to enforce the note. KRM filed a counterclaim and third party suit against TTI, alleging breach of contract due to TTI's failure to obtain proper permits for the wall project. The trial court construed the promissory note and wall construction contract separately, entering judgment for Babbitt on the promissory note and for KRM on the breach of contract claim. All parties filed notices of appeal of a number of the trial court's decisions.

We conclude the trial court properly construed the promissory note and wall contract as separate agreements but erred in the decisions to pierce the corporate veil and deny postjudgment interest on the entirety of the judgment for Babbitt. Therefore, we affirm in part and reverse as to only those two issues.

I.

BACKGROUND

KRM is a condominium owners' association for the Kingsgate Ridge Manor Condominium complex in Kirkland, Washington. Babbitt is the sole officer and shareholder of TTI, a Washington corporation and licensed and bonded construction contractor. TTI specializes in logging, utility, and earthwork, including retaining wall construction.

Beginning in 2009, Babbitt and his contractor corporations[1] successfully bid on and completed several maintenance projects for KRM. While working on these projects for KRM, Babbitt observed that the association experienced

---

[1] Babbitt was previously the sole officer and shareholder of AAA Tree Tech, Inc., which was administratively dissolved in 2011.

2

chronic underfunding. To help KRM, Babbitt offered "value engineering" and term financing on some of the projects.

In 2012, KRM encountered significant financial trouble. It was underfunded and had outstanding bills. In addition, rocks began falling out of one of the retaining walls in its condominium complex and KRM became concerned about possible injury to people and property. KRM had attempted to obtain a conventional bank loan but was rejected due to a lack of financial reserves.

Having exhausted its options, KRM invited Babbitt to an association board meeting in August 2012 to discuss a loan. KRM gave Babbitt a written proposal requesting a $600,000 loan at 10 percent fixed interest with monthly payments of $11,000. The proposal included a condition that Babbitt's construction company submit an estimate for replacement of the complex's failing rock wall, which KRM would consider against three other competitive bids.[2] Babbitt said he would try to help KRM, but indicated he needed time to think about the terms and secure funding for the loan. The parties did not execute a written agreement at that time.

Babbitt obtained $150,000 in financial assistance from his uncle. Babbitt then issued a $150,000 cashier's check to KRM for immediate cash reserves. He paid $56,561.04 towards KRM's homeowners' insurance bill, water district bill, sewer bill, and Home Depot bill.

---

[2] The proposal erroneously identified Babbitt's corporation as AAA Tree Tech rather than TTI. AAA Tree Tech had already been administratively dissolved by the time of the proposal.

3

TTI prepared an estimate for replacement of the retaining wall. It proposed construction of a Keystone wall for $299,847. The estimate specified exclusions for "permits and fees." Two officers of the KRM board approved and signed the bid on October 9, 2012. Due to winter weather conditions, TTI did not begin construction until March 2013.

In February 2013, Babbitt prepared a promissory note to memorialize the loan. Prior to the promissory note, Babbitt had advanced money and paid KRM's bills. The promissory note provided for a loan of $600,000, at 10 percent interest per annum, with monthly payments of $12,748.23, over a repayment term of five years. The terms also included late fees, attorney fees, and an acceleration of debt clause. These terms differed from those of KRM's initial loan proposal.

Babbitt presented the promissory note to the full KRM board on February 12, 2013. The board agreed to the terms, and two of its officers signed the note. The Board members knew the promissory note contained terms differing from the original loan proposal. KRM made its required payments in February and March 2013. KRM then requested an indefinite deferral on the remaining payments. Babbitt agreed to defer the payments, with the understanding interest would continue to accrue during the deferral period.

TTI began demolition and construction of the retaining wall in March 2013. TTI soon discovered site conditions requiring significant changes to the scope of work, including a larger wall made up of a different stonework system. After consulting with KRM's construction manager, TTI provided a change order

4

reflecting an increase in cost to $331,332.46, reduced by a $10,000 credit for deferred pipe upgrades.

TTI completed a non-reinforced StoneTerra retaining wall ranging from two feet to ten feet tall. Despite the requirements of Kirkland's municipal code, neither TTI nor KRM obtained a permit for construction of the wall.

In April 2014, KRM's new financial manager, Robert Brencic, discovered the promissory note while reviewing the association's bills and books to create a budget. KRM's board asked Brencic to investigate the promissory note to determine the association's obligations. Brencic determined KRM owed Babbitt a total of $538,194.40 less the two payments made in February and March 2013. Brencic prepared an amortization schedule for payments over five years.

KRM approved Brencic's findings and asked him to approach Babbitt to request waiver of the interest on the loan. Babbitt consented to a five year repayment period and waiver of the late fees to date, but refused to waive interest. Babbitt also offered the balance of the $600,000, but KRM did not want the additional money. KRM agreed to Babbitt's terms but made only four payments. Babbitt filed suit for default on the promissory note in September 2015.

In March 2016, the trial court granted Babbitt's motion for partial summary judgment for $150,000 as recovery for the cash payment to KRM. The trial court, however, did not rule on the enforceability of the promissory note and reserved judgment on Babbitt's request for attorney fees and costs and prejudgment

interest. KRM subsequently satisfied the partial summary judgment, resulting in total payments of $228,407.42 on the principal loan amount of $538,194.40.

KRM asserted a counterclaim against Babbitt and a third party claim against TTI for breach of contract in June 2016. KRM claimed Babbitt and TTI failed to obtain the necessary permits to build the wall, failed to inform KRM no permits had been obtained, and failed to use or retain engineered drawings to prove proper construction of the wall.

During a six-day bench trial, the parties argued about the enforceability of the promissory note, the duty to obtain permits for the wall, and the proper construction of the wall. KRM also claimed TTI failed to construct a properly engineered wall, which subsequently required remediation and rebuilding. According to KRM, the permitting process would have prevented the engineering deficiency and the need for reconstruction of the wall. TTI contended the approved estimate for the wall construction specifically excluded permits and fees, requiring KRM to obtain the proper permits for the project. TTI argued it had properly built the wall.

The trial court enforced the promissory note and awarded judgment, prejudgment interest, and attorney fees to Babbitt amounting to $502,216.92. The trial court also found TTI had materially breached the construction contract by failing to obtain a permit and "building a wall that is in danger of falling." The trial court extended personal liability to Babbitt, finding Babbitt "ignored the corporate distinction with regard to collecting payment for the wall project . . . Mr. Babbitt used the corporate protection of TTI as a shield to avoid personal

6

liability for failure to obtain a permit." Because Babbitt did not reimburse TTI for the wall project, the trial court inferred TTI was underfunded and unable to satisfy a judgment in the action. As a result of this underfunding, the trial court concluded "an injustice will result if the court observes the corporate formalities, favoring Mr. Babbitt in the transactions at issue. Therefore, the court will disregard the corporate formalities in this case." The court awarded KRM a judgment of $258,143 (the cost to remediate the wall) without interest or attorney fees.

Both parties filed multiple postjudgment motions including motions for reconsideration pertaining to sanctions, attorney fees, and offsets.

KRM appeals. Babbitt and TTI cross-appeal.

## II.
## ANALYSIS

The trial court heard several days of testimony and issued findings of fact and conclusions of law on Babbitt's and KRM's claims. Where the trial court has weighed the evidence, the reviewing court's role is limited to determining whether substantial evidence supports the findings of fact, and whether those findings support the trial court's conclusions of law. Ford Motor Co. v. City of Seattle, Exec. Serv. Dep't., 160 Wn.2d 32, 56, 156 P.3d 185 (2007). "Substantial evidence to support a finding of fact exists where there is sufficient evidence in the record 'to persuade a rational, fair-minded person of the truth of the finding.'" Hegwine v. Longview Fibre Co., Inc., 162 Wn.2d 340, 353, 172 P.3d 688 (2007) (quoting In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004)). An

appellate court will not substitute its judgment for that of the trial court, reweigh the evidence, or gauge witness credibility. In re Marriage of Rockwell, 141 Wn. App. 235, 242, 170 P.3d 572 (2007).

In contrast, we review conclusions of law de novo. Hegwine, 162 Wn.2d at 353.

A.    Separate Agreements or Same Transaction?

KRM claims the trial court erroneously construed the promissory note and wall construction contract as two separate agreements. KRM contends the promissory note and construction contract comprised one transaction between the parties, which Babbitt/TTI breached by failing to obtain a permit to construct the wall. We agree with the trial court's interpretation of the promissory note and construction contract as two separately enforceable agreements.

Whether separate agreements are part of one transaction depends upon the intent of the parties as shown by the agreements. Boyd v. Davis, 127 Wn.2d 256, 261, 897 P.2d 1239 (1995). The trial court must discern the intent of the parties. Boyd, 127 Wn.2d at 261. The parties' intent is a question of fact. Don L. Cooney, Inc. v. Star Iron & Steel Co., 12 Wn. App. 120, 122, 528 P.2d 487 (1974). A trial court's findings of fact are reviewed for substantial evidence. Hegwine, 162 Wn.2d at 352.

Discerning the parties' intent in this case required the court to examine the loan proposal, wall contract, and promissory note. The initial loan proposal requested a $600,000 loan with fixed interest and the condition Babbitt's construction company submit a competitive bid for the wall project. The proposal

made no guarantee Babbitt's company would win the project. The condition only required the company submit a competitive bid.

Babbitt, as representative of TTI, bid on the wall construction project. KRM accepted this bid, resulting in the contract between TTI and KRM. This contract contained terms related to only the construction of the wall and did not reference the proposal or loan from Babbitt.

Several months after the proposal and wall contract, Babbitt memorialized his loan to KRM in the promissory note. KRM board members reviewed and signed the promissory note, which became a valid contract between KRM and Babbitt. KRM argues the promissory note was a modification of the contract formed by its proposal. But in this case, the promissory note is a negotiable instrument separate from the wall contract or the proposal.

A negotiable instrument is "an unconditional promise or order to pay a fixed amount of money." RCW 62A.3-104(a). A promise to pay is unconditional "unless it contains an express condition to payment and states that (1) the promise or order to pay is subject to or governed by another writing or (2) rights or obligations with respect to the promise or order to pay are stated in another writing." Alpacas of America, LLC v. Groome, 179 Wn. App. 391, 396-97, 317 P.3d 1103 (2014) (citing RCW 62A.3-106(a)).

Here, the text of the promissory note demonstrates KRM's unconditional promise to pay Babbitt. The promissory note makes no reference to the wall construction project or any other agreement. As a result, the promissory note is a negotiable instrument establishing a "separate promise" independent of the

9

wall contract, governing only the financial relationship between Babbitt and KRM. See Alpacas of America, 179 Wn. App. at 399.

Additionally, the construction contract and the promissory note were prepared months apart and without contingencies or conditions. Again, the two agreements make no reference to, or mention of, the other. KRM needed the loan from Babbitt regardless of whether TTI or another corporation built the wall. Thus, the facts point toward the parties' intention to establish separate agreements on the two distinct issues—the loan and the wall construction.

Based on the documents and the evidence presented, substantial evidence supports the trial court's separate construction of the agreements. The trial court properly interpreted the promissory note and accepted construction estimate as two distinct, valid contracts governing the relationships between the various parties.

B.    Affirmative Defenses

At trial, in response to Babbitt's claim on the promissory note, KRM pursued the affirmative defenses of mistake, misrepresentation, and fraud, claiming it would never have entered the transaction knowing the contractor would not obtain permits. Because these defenses are inapplicable to the promissory note claim, the trial court properly rejected them.

KRM's affirmative defenses depend in large part on its one-contract theory. That is, if the promissory note and wall are part of one agreement, then success on the affirmative defenses would theoretically allow KRM to avoid liability on the note. But, under the proper interpretation of the promissory note

and construction contracts as two separate agreements, these affirmative defenses are inapposite.

On appeal, KRM argues that the affirmative defenses apply solely to the promissory note, alleging Babbitt committed fraud or misrepresentation by writing the loan for an amount greater than KRM actually borrowed and included terms beyond those in the initial proposal. But the KRM Board reviewed the promissory note and approved the terms, despite the differences. KRM voluntarily signed the agreement and cannot now claim ignorance of its terms. See Michak v. Transnation Title Ins. Co., 148 Wn.2d 788, 799, 64 P.3d 22 (2003). As a result, the trial court properly dismissed the affirmative defenses of mistake, misrepresentation, and fraud.

### C. Attorney Fees

#### 1. Fee Award to Babbitt But Not KRM

KRM contends the trial court erroneously awarded attorney fees to Babbitt under the terms of the promissory note or should have awarded fees to both sides. Based on the terms of the two separate contracts, the trial court properly awarded fees only to Babbitt.

Attorney fees and costs may be recovered only when authorized by private agreement of the parties, statute, or a recognized ground in equity. Pa. Life Ins. Co. v. Dep't of Emp't Sec., 97 Wn.2d 412, 413, 645 P.2d 693 (1982). RCW 4.84.330 provides for award of attorney fees to the prevailing party in a contract dispute. The prevailing party "is one that receives an affirmative judgment in its favor." Newport Yacht Basin Ass'n of Condo. Owners v. Supreme

11

NW, Inc., 168 Wn. App. 86, 98, 285 P.3d 70 (2012). For a court to award attorney fees, the prevailing party must substantially prevail but does not need to have succeeded on its entire claim. Newport Yacht Basin, 168 Wn. App. at 98. A defendant can recover as a prevailing party by successfully defending against a plaintiff's claims. Newport Yacht Basin, 168 Wn. App. at 99.

A trial court's determination of whether a party is entitled to attorney fees is an issue of law reviewed de novo. Boguch v. Landover Corp., 153 Wn. App. 595, 615, 224 P.3d 795 (2009).

Here, the promissory note contained a provision for KRM to pay "reasonable attorney fees . . . for collection of this Note upon default." According to the trial court, Babbitt prevailed on the enforcement of the promissory note. As a result, this term in the note authorized the award of attorney fees to Babbitt for the expenses required to obtain repayment. Thus, the trial court properly awarded attorney fees and costs to Babbitt.

In contrast, the wall contract does not include a provision for attorney fees. Therefore, KRM had no contractually established means for recovering fees in its successful claim for breach of the construction contract.[3] The trial court properly declined to awarded attorney fees and costs to KRM.

---

[3] In its reply brief, KRM argues that it should recover attorney fees under the two-contract theory because it prevailed when Babbitt recovered only one-third of his requested recovery under the promissory note. KRM raises this argument for the first time in the reply brief. We will not consider issues raised for the first time in a reply brief. RAP 10.3(c); Ainsworth v. Progressive Cas. Ins. Co., 180 Wn. App. 52, 78 n.20, 322 P.3d 6 (2014).

2.    Specific Attorney Fees

KRM assigns error to the trial court's award of specific attorney fees. When authorized by contract, the determination of a reasonable attorney fee award is a matter within the trial court's discretion. Noble v. Safe Harbor Family Pres. Trust, 167 Wn.2d 11, 15, 216 P.3d 1007 (2009). "In order to reverse an attorney fee award made pursuant to a statute or contract, an appellate court must find the trial court manifestly abused its discretion." Noble, 167 Wn.2d at 17. The party challenging the fee award bears the burden of demonstrating the award was clearly untenable or manifestly unreasonable. Washington State Communication Access Project v. Regal Cinemas, Inc., 173 Wn. App. 174, 219, 293 P.3d 413 (2013).

KRM contends the trial court erred by awarding fees for duplicative, unreasonable, and unproductive work. Babbitt requested compensation for 380.10 hours of attorney work. The trial court found 264 hours were reasonably expended by counsel and awarded attorney fees based on that number. The trial court provided a list of all the reductions due to duplicative, inaccurate, excessive, unsuccessful, or unproductive work. KRM disagrees with the substantial reduction in hours, claiming further reduction was required. But nothing in the record demonstrates manifest abuse of discretion. Therefore, we will not disturb the attorney fees award on appeal.

D.    Chapter 64.50 RCW Notice Requirements

On cross-appeal, TTI claims the trial court should have dismissed KRM's construction defect claim for failure to comply with the required notice set forth in RCW 64.050.030 and 64.050.040(2)(a). KRM counters its failure to notify was not fatal to the claim. We agree with KRM.

Chapter 64.50 RCW sets forth notice requirements for construction defect claims. Construction professionals must "provide notice to each homeowner upon entering into a contract for sale, construction, or substantial remodel of a residence, of the construction professional's right to offer to cure construction defects before a homeowner may commence litigation against the construction professional." RCW 64.50.050(1). The statute provides, if the contractor does not give this notice, the chapter shall not bar a homeowner's lawsuit. RCW 64.50.050(3).

Chapter 64.50 RCW establishes additional responsibilities for plaintiff homeowners' construction defect cases. Homeowners must provide at least 45 days' notice to a construction professional prior to filing an action. RCW 64.50.020(1). For condominium construction defect claims, the board of directors for the homeowners' association must mail or deliver written notice of the commencement of a construction defect action to each homeowner prior to service of the summons or complaint on a defendant. RCW 64.50.040(1)(2)(a). Additionally, the plaintiff in a construction defect action must file with the court, and serve the defendant with, a list of known construction defects within thirty

days after commencement of the action. RCW 64.50.030(1), (2). This list must contain a description of the allegedly defective construction. RCW 64.50.030(2).

Only one case has interpreted the notice requirements in chapter 64.50 RCW. In Lakemont Ridge Homeowners Assoc. v. Lakemont Ridge Limited P'ship, 156 Wn.2d 696, 131 P.3d 905 (2006), the Washington Supreme Court considered the interplay between RCW 64.50.020 and RCW 64.50.050. In Lakemont, the condominiums at issue were constructed prior to the enactment of chapter 64.50 RCW, and the construction professional did not provide the homeowners with notice of the prelitigation requirement of notice and opportunity to cure. 156 Wn.2d at 697-98. The homeowners' association brought a construction defect claim after enactment of chapter 64.50 RCW, but failed to comply with notice to the construction professional as required by RCW 64.50.020(1). Lakemont, 156 Wn.2d at 697-98.

The court concluded the homeowners' association's failure to give notice was not fatal to the construction defect claim, because the prelitigation notice requirement "became operative only where the construction professionals have given prior notice to the homeowner of the requirement." Lakemont, 156 Wn.2d at 698. If the construction professional provides notice of the prelitigation notice requirement, then the homeowner must give notice of the alleged defects and comply with the requirements of chapter 64.50 RCW. Lakemont, 156 Wn.2d at 703. If the construction professional fails to give notice of the prelitigation notice requirement, then RCW 64.50.050(3) explicitly states this failure does not bar a claim. Lakemont, 156 Wn.2d at 703. This interpretation serves the express

15

purpose of "*preserving* adequate rights and remedies for property owners." Lakemont, 156 Wn.2d at 704.

TTI correctly points out that Lakemont examined different notice provisions. TTI relies on RCW 64.50.030 and 64.50.040 mandating prelitigation notice to condominium owners and postfiling notice of defects rather than RCW 64.50.020 and 64.50.050. But the language of RCW 64.50.050(3) places the burden on the construction professional to give notice of the prelitigation requirements to trigger homeowner duties under the statute. The statute provides, "[t]his *chapter* shall not preclude or bar any action if notice is not given to the homeowners as required by this *section.*" RCW 64.50.050(3) (emphasis added). Thus, a homeowner's failure to comply with any of the requirements of chapter 64.50 RCW will not preclude an action if the construction professional did not give notice at the time of contracting.

TTI does not claim to have fulfilled the notice obligation of RCW 64.50.050. Because TTI did not give notice as required, KRM's failure to comply with RCW 64.50.030 and 64.50.040 was not fatal to the breach of contract claim.

Even if KRM was required to comply with the statutory obligations, we do not believe dismissal would be a proper remedy for failure to fulfill the notice

16

requirements of RCW 64.50.030.[4] The language of RCW 64.50.030 indicates the court has discretion over the filing period for the defect list.[5] RCW 64.50. 030(2) requires filing and service of a description of the construction defects "within thirty days after the commencement of the action or within such longer period as the court in its discretion may allow." This discretion with regard to the allowable time frame of RCW 64.50.030 suggests the legislature did not intend strict compliance.[6] Further, remedies for noncompliance may include enforcement at the trial court level, akin to an order to compel discovery. As such, mandatory dismissal of the claims would not be the appropriate remedy for failure to provide notice under these provisions.

Whether RCW 64.50.00(3) or the discretion permitted under RCW 64.50.030 applies, the trial court's decision to deny dismissal for failure to comply with the statute was not error.

---

[4] We note TTI/Babbitt's standing is questionable on the issue of KRM's failure to provide notice to the individual homeowners under RCW 64.50.040. A party has standing if it is arguably within the zone of interest to be protected by the statute and has suffered an injury in fact. Branson v. Port of Seattle, 152 Wn.2d 862, 875-876, 101 P.3d 67 (2004). RCW 64.50.040 governs the board of directors' responsibility to individual homeowners. Thus, TTI/Babbitt is arguably not within the zone of interest protected by that section of chapter 64.50 RCW. Neither party raised this issue on appeal.

[5] Courts do not construe unambiguous statutes. Davis v. State ex rel. Dep't of Licensing, 137 Wn.2d 957, 963, 977 P.3d 554 (1999). "If the statute's meaning is plain on its face, then courts must give effect to its plain meaning as an expression of what the Legislature intended." State v. J.M., 144 Wn.2d 472, 480, 28 P.3d 720 (2001). In the case of ambiguity, however, the court's fundamental objective is to ascertain and carry out the legislative intent. J.M., 144 Wn.2d at 480.

[6] The legislature included mandatory dismissal as the remedy elsewhere in chapter 64.50 RCW. RCW 64.50.020(6) provides that "[a]ny action commenced by a claimant prior to compliance with the requirements of this section shall be subject to dismissal without prejudice, and may not be recommenced until the claimant has complied with the requirements of this section." This section pertains to the required 45 days' notice and opportunity to cure provided by the homeowner to the construction professional. "This section" refers only to RCW 64.50.020, rather than the entirety of chapter 64.50 RCW. The legislature clearly included mandatory dismissal to ensure strict compliance.

17

E. Disregard of the Corporate Form

The trial court pierced the corporate veil after concluding injustice would otherwise result due to its belief Babbitt intentionally underfunded TTI and manipulated the corporate form to his benefit. Babbitt contends the trial court improperly disregarded the corporate entity without evidence of the requisite abuse of the corporate form. We agree.

The doctrine of disregard of the corporate entity, or piercing the veil, is an equitable remedy imposed in exceptional circumstances where recognition of the corporate form would aid in perpetrating a fraud or result in a manifest injustice. Truckweld Equip. Co., Inc. v. Olson, 26 Wn. App. 638, 643-44, 618 P.2d 1017 (1980). To pierce the veil, (1) the corporate form must have been intentionally used to violate or evade a duty, and (2) disregard must be necessary to prevent unjustified loss to the injured party. Meisel v. M&N Modern Hydraulic Press Co., 97 Wn.2d 403, 410, 645 P.2d 689 (1982). Regarding the first element, abuse of the corporate form typically involves fraud, misrepresentation, or some form of manipulation to the entity's benefit and the creditor's detriment. Meisel, 97 Wn.2d at 410. Regarding the second element, the "wrongful corporate activities must actually harm the party seeking relief so that disregard is necessary." Meisel, 97 Wn.2d at 410. "Intentional misconduct must be the cause of the harm that is avoided by the disregard." Meisel, 97 Wn.2d at 410. The corporation should not be disregarded solely because its assets are not sufficient to meet its obligations. Meisel, 97 Wn.2d at 411; Norhawk Invest., Inc. v. Subway Sandwich Shops, Inc., 61 Wn. App. 395, 399-400, 811 P.2d 221 (1991).

The alter ego doctrine provides, "where one entity 'so dominates and controls a corporation that such corporation is [the entity's] alter ego, a court is justified in piercing the veil of corporate entity and holding that the corporation and private person are one and the same.'" In re Rapid Settlements, Ltd. v. Symetra Life Ins. Co, 166 Wn. App. 683, 692, 271 P.3d 925 (2012) (quoting Standard Fire Ins. Co. v. Blakeslee, 54 Wn. App. 1, 5, 771 P.2d 1172 (1989)). The doctrine is most commonly invoked "to impose personal liability upon corporate officers for fraud committed by a corporation." Standard Fire, 54 Wn. App. at 5-6. The trial court will find a corporate entity is one and the same with another entity "when the corporate form has been intentionally used to violate or evade a duty." In re Rapid Settlements, 166 Wn. App. at 692.

The issue of whether the corporate form should be disregarded is a question of fact. Norhawk Invest., Inc., 61 Wn. App. at 398. A trial court's findings of fact are reviewed for substantial evidence. Hegwine, 162 Wn.2d at 352.

Even where the entities are alter egos, piercing the corporate veil requires misconduct. See In re Rapid Settlements, 166 Wn. App. at 692. Here, the trial court made no findings related to fraud, misrepresentation, or corporate misconduct.[7] Without evidence of such behavior, Babbitt's conduct did not rise to the level of misconduct generally required to pierce the corporate veil.

---

[7] In its findings of fact about the breach of promissory note, the trial court stated, "[t]here was no evidence that Mr. Babbitt, on behalf of his corporation, made any misrepresentations or fraudulent inducements to persuade KRM to accept his bid."

Instead of fraud or misrepresentation, the trial court grounded its rationale for corporate disregard on TTI's presumed undercapitalization. But based on Meisel and Norhawk Investments, undercapitalization alone does not amount to misconduct requiring disregard of the corporate form. "The absence of an adequate remedy alone does not establish corporate misconduct." Meisel, 97 Wn.2d at 411. Norhawk Investments specifically states, "the separate existence of a corporation should not be disregarded solely because its assets are not sufficient to discharge its obligations." 61 Wn. App. at 399-400. Therefore, the trial court's reliance on TTI's presumed undercapitalization does not support corporate disregard.

The trial court pierced the corporate veil based only on the lack of corporate distinction and presumed undercapitalization of TTI, without evidence TTI attempted to violate or evade a duty to KRM. Because TTI's conduct did not rise to the level of fraud, misconduct, or manipulation to benefit TTI, the trial court erred by disregarding the corporate entity and holding Babbitt personally liable. Therefore, we reverse on this issue.

F. Postjudgment Interest

Babbitt argues the trial court erred by failing to award postjudgment interest on the prejudgment interest awarded on the principal judgment. KRM contends RCW 4.56.110 authorizes but does not require postjudgment interest on a judgment with both principal and interest. Due to the statutory requirement of postjudgment interest on the entirety of the judgment, the trial court should have awarded postjudgment interest on the prejudgment interest.

RCW 4.56.110(1) allows for postjudgment interest for judgments based on written contracts at the rate specified in the contract. Sharbano v. Universal Underwriters, Ins. Co., 158 Wn. App. 963, 971, 247 P.3d 430 (2010). "When prejudgment interest is awarded, it is added to the judgment and becomes part of the judgment principal." State v. Trask, 98 Wn. App. 690, 695-96, 990 P.2d 976 (2000). Postjudgment interest is calculated based on this new judgment principal. Sharbano, 158 Wn. App. at 971. The judgment then accrues interest at the stipulated rate until paid in full. Trask, 98 Wn. App. at 696; RCW 4.56.110(1).

Postjudgment interest is mandatory under RCW 4.56.110. TJ Landco, LLC. v. Harley C. Douglass, Inc., 186 Wn. App. 249, 256, 346 P.3d 777 (2015). "Consequently, awards of postjudgment interest are matters of law that are reviewed de novo." TJ Landco, 186 Wn. App. at 256.

Here, the trial court awarded Babbitt a principal judgment of $309,786.98 and prejudgment interest of $187,149.94. The judgment provided an interest rate of 10 percent for both the principal judgment and attorney fees and costs, but did not establish an interest rate for the prejudgment interest.

Based on Sharbano and Trask, the prejudgment interest merges with the principal judgment to become the new total judgment. This new total judgment serves as the basis for calculating postjudgment interest.

KRM contends RCW 4.56.110 does not require postjudgment interest on prejudgment interest awards based on additional language in Sharbano that the statute, "authorizes a trial court to calculate postjudgment interest on a judgment that already contains within it both principal and interest, especially where a

21

written underlying contract so provides." 158 Wn. App. at 971. But this ignores the language of RCW 4.56.110, which states "interest on judgments shall accrue." The use of "shall" imposes a mandatory requirement unless a contrary legislative intent is apparent. Erection Co. v. Dep't of Labor and Indus., 121 Wn.2d 513, 518, 852 P.2d 288 (1993). Thus, the award of postjudgment interest is not discretionary.

Postjudgment interest accrues on the principal judgment. An award of prejudgment interest combines with the original principal amount to become the total principal for the purposes of postjudgment interest. As a result, Babbitt was entitled to postjudgment interest on the prejudgment interest award. The trial court's failure to award interest on this prejudgment interest was error requiring reversal and recalculation.

G. Attorney Fees on Appeal

Babbitt and KRM both request fees on appeal.

Babbitt requests fees on appeal based on the attorney fees provision of the promissory note. As noted above, the promissory note included a term for "reasonable attorney fees . . . for collection of this Note upon default." This term applies to appellate proceedings as well. "A provision in a contract providing for the payment of attorneys' fees in an action to collect any payment due under the contract includes both fees necessary for trial and those incurred on appeal as well." Granite Equip. Leasing Corp. v. Hutton, 84 Wn.2d 320, 327, 525 P.2d 223 (1974). As the prevailing party in this appeal pertaining to the collection of the Note on default, Babbitt is entitled to attorney fees and costs on appeal.

Under RAP 18.1(b), the party must devote a section of its opening brief to a request for attorney fees and expenses. KRM failed to request attorney fees on appeal in its opening brief, waiting until the reply brief to raise the issue. As a result, the request does not comply with RAP 18.1(b). Furthermore, KRM lacks a contractual basis to recover attorney fees and does not prevail on appeal. Therefore, we decline to award fees on appeal to KRM.

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

_Chun, J._

WE CONCUR: