[No. 3635–II.   Division Two.   July 2, 1980.]

TRUCKWELD EQUIPMENT COMPANY, INC., *Appellant,* v. CARL OLSON, ET AL, *Respondents.*

*Christopher M. Huss* and *Daniel E. McKelvey,* for appellant.

*Merrifield B. Rees,* for respondents.

REED, C.J.—Plaintiff Truckweld Equipment Company, Inc. (Truckweld), appeals from a Pierce County Superior Court judgment which denied its claim against defendant Carl Olson (Olson), director and sole stockholder of defendant Aztec Enterprises, Inc. (Aztec). The action arose out of a contract for modification and assembly of gravel hauling equipment for defendant Aztec. Olson submits additional issues on cross appeal; we affirm the trial court as to all matters raised.

The essential facts are summarized as follows.

In early October 1975, Aztec was incorporated in Washington with a capital contribution of $500. Aztec's incorporator and sole stockholder, H. B. Hunting (Hunting), supervised Aztec's gravel hauling operations for the following year with limited financial success. Aztec was plagued with persistent working capital problems which frequently required additional short–term borrowing, typically through receivables financing. One frequent source of financing was defendant Olson, an Aztec customer with diverse holdings in the western Washington area. Olson was involved in, among other things, real estate investment and apartment construction. In April of 1976, Olson acquired from a third party the gravel pit out of which Aztec was conducting its gravel mining and hauling operations. Olson's apparent intent in acquiring the pit was, after removal of the valuable gravel, construction of residential structures which would capitalize on the view made possible by the excavation. Accordingly, he verbally contracted with Aztec to allow continued gravel mining at 50 cents per cubic yard.

During the following months Olson made a number of loans to Aztec which were orally secured by Aztec's receivables. Despite Aztec's shaky financial structure, Olson

became interested in acquiring it. He requested from his accountant, B. C. Burns (Burns), a feasibility study involving Aztec's current and future operations.

After completion of the study, and upon the recommendation of Burns, Olson executed a stock purchase agreement with Hunting in late August 1976. Under the terms of the contract Olson became Aztec's sole stockholder in exchange for Olson's assumption of all Aztec's debts for which Hunting was personally liable. Contemporaneously with this exchange, Olson hired Burns away from his accounting firm and appointed him as Aztec's office and financial manager. Burns' responsibilities included the preparation and execution of all corporate paperwork including corporate minutes, leases and licenses. In effect, from the time of his initial purchase, day–to–day operation of the company was delegated to Burns, Olson making only periodic inquiry as to the corporation's well–being.

Shortly afterward Burns met with a salesman of Truckweld to discuss assembly and modification of gravel hauling equipment. Although Truckweld had previously been unwilling to extend credit to Aztec, it agreed to consider the matter in this instance. At Burns' request and without Olson's knowledge, Truckweld contacted Olson's banker at Puget Sound National Bank (Bank) to inquire about a loan Olson was intending to arrange between the bank and Aztec. Although the banker was unfamiliar with Aztec or its financial condition, he did attest to Olson's good reputation in the business and financial community and the Bank's willingness to lend Olson additional capital if requested. No details of past or future loan amounts were discussed. With this information Truckweld agreed to extend Aztec credit on a 30–day open account basis. Truckweld, however, neither sought Olson's personal guaranty on the credit account, nor contacted Olson directly regarding terms of the credit arrangement.

Aztec delivered to Truckweld four trucks to be modified in accordance with agreed specifications. Three of the

trucks were owned either by Olson or his sole proprietorship, Totem Lease Company. No lease payments were ever made to Olson, and Burns—although instructed to do so—had failed to have Aztec execute a formal leasing agreement on one truck. Truckweld made no effort to ascertain the true owner of the trucks to be modified and was thus unaware of the "loose" lease arrangement when it extended credit to Aztec.

After several delays in modifying Aztec's trucks, Truckweld delivered all the trucks and equipment ordered except the truck subject to the unwritten lease and one "pony trailer" Truckweld had assembled. The equipment was delivered over a period from October 1976 through January 1977.

On November 17, 1976, Aztec obtained a $75,000 loan from the Bank for working capital. As security, Aztec pledged "a portion of the equipment and improvements which had been delivered by Truckweld to Aztec," and Olson personally guaranteed the loan.

In December 1976, the Aztec account became delinquent. Burns reassured Truckweld that payment would be forthcoming and a direct contact with Olson produced similar assurances. After returning from an overseas trip in early February 1977, however, Olson advised Truckweld that Burns had resigned and abandoned Aztec in Olson's absence. Shortly thereafter the Internal Revenue Service filed tax liens against Aztec and the Bank foreclosed upon its collateral, including the equipment Truckweld had delivered to Aztec. The trial court found:

> The proceeds from the sale of said TRUCKWELD equipment were applied either to reduce the principle amount of the Puget Sound National Bank loan or to retire other personal bank loans in the name of OLSON.[1]

---

[1] Plaintiff makes no argument regarding Olson's "other" personal loans satisfied from the proceeds of the trucks. Our review of the record, however, suggests that the other loans were obtained by Olson to finance the original purchase of the trucks.

In the interim between default and the Bank's foreclosure, Truckweld had unsuccessfully negotiated with Olson for his personal guaranty of the debt. Olson did, however, indicate a willingness to accept responsibility for modification of the trucks he had leased to Aztec. In addition, Olson at one point offered his personal check in payment for the modification costs associated with the last truck still in Truckweld's possession. Truckweld was unwilling to accept his check and retained possession of the Olson truck. Truckweld commenced this action in March of 1977, 7 months after Olson's acquisition of Aztec.

■ Truckweld's principal contention, both at trial and on appeal, is that the facts in this case require disregarding the corporate character of Aztec and placing the liability for Truckweld's services upon Olson individually. The question whether the corporate form should be disregarded is a question of fact. In this case the trial court resolved the issue favorably to Olson. Even though the question is a close one, that ruling must stand if it is supported by substantial evidence. *Grayson v. Nordic Constr. Co.,* 92 Wn.2d 548, 599 P.2d 1271 (1979); 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 41.3 (rev. ed. 1974). Arguing that Olson himself overtly intended to disregard the corporate form, Truckweld points to the absence of several important corporate documents such as corporate minutes, resolutions, tax returns, and registration or lease arrangements in urging us to pierce the corporate veil. Additionally, Truckweld argues that Aztec never paid Olson for the leased trucks or the gravel removed, that Olson never paid Aztec for gravel delivered to his separate construction site, that stock certificates were never issued to Olson, and that Olson never documented a license agreement for excavation at the gravel pit. We do not agree that these facts require as a matter of law that the corporate nature of Aztec be disregarded.

■■ The doctrine of disregarding the corporate entity or piercing the corporate veil is an equitable remedy imposed to rectify an abuse of the corporate privilege. 1 W.

Fletcher, §§ 41 *et seq.* Typically the corporation is considered an entity separate and distinct from its officers or stockholders even where they are only one in number. *Grayson v. Nordic Constr. Co., supra.* In exceptional circumstances, however, the corporate entity will be disregarded where its recognition would aid in perpetrating a fraud or result in a manifest injustice. *Harrison v. Puga,* 4 Wn. App. 52, 480 P.2d 247, 46 A.L.R.3d 415 (1971).

Truckweld's claim for relief in the instant case, however, lacks the characteristic injustice typically found in a piercing the corporate veil situation. The informality with which Aztec may have been operated neither prejudiced nor misled Truckweld in its consideration of Aztec's credit application. Nor does plaintiff challenge the trial court's finding that Olson intended that the formalities be observed and that Burns failed to carry out instructions. In any event, we cannot see how Truckweld's position would be different had Aztec meticulously documented its corporate actions. *Frigidaire Sales Corp. v. Union Properties, Inc.,* 88 Wn.2d 400, 562 P.2d 244 (1977); *Block v. Olympic Health Spa, Inc.,* 24 Wn. App. 938, 604 P.2d 1317 (1979); *Soderberg Advertising, Inc. v. Kent–Moore Corp.,* 11 Wn. App. 721, 524 P.2d 1355 (1974); *Sirmons v. Arnold Lumber Co.,* 167 So. 2d 588 (Fla. 1964).[2] Moreover, we see no injustice to Truckweld from the mere fact that Aztec was unable eventually to pay for the assembly and modifications. The limited liability afforded a stockholder of an otherwise legitimate corporate enterprise does not, without more, justify invocation of the disregard theory. Personal liability on that basis alone would undermine the very foundation of the entity concept. *See* 1 W. Fletcher at § 41.2. Typically, the injustice which

---

[2]*See also Plumbers & Fitters, Local 761 v. Matt J. Zaich Constr. Co.,* 418 F.2d 1054, 1058 (9th Cir. 1969): "In principle, . . . the disregarding of the corporate form of business should not rest on the manner of doing business in general but should rest on the *effect that the manner of doing business has on the particular transaction involved.* . . . Generally speaking, the doctrine is designed to prevent a person from doing injury and then escaping responsibility by hiding behind a corporate shield." (Italics ours.)

dictates a piercing of the corporate veil is one involving fraud, misrepresentation, or some form of manipulation of the corporation to the stockholder's benefit and creditor's detriment. *Morgan v. Burks,* 93 Wn.2d 580, 611 P.2d 751 (1980). The trial court found no such wrongful conduct in the case at bar, and that finding is supported by the substantial evidence we have outlined.

Similarly, Truckweld's allegation that Aztec was inadequately capitalized fails to convince us that Olson abused the corporate entity. Although there may be situations in which a corporation is so thinly capitalized that it manifests a fraudulent intent, we do not find such to be true in the case at bar. *See Frigidaire Sales Corp. v. Union Properties, Inc., supra* at 404. Olson acquired Aztec when it was financially troubled; he was not the original incorporator and he sought only to improve Aztec's profit picture.[3] Despite gross sales of over $800,000 it appears a combination of unfortunate timing and persistent working capital problems sounded Aztec's death knell. We know of no rule of law requiring a corporate stockholder to commit additional private funds to an already faltering corporation.[4] *See Sutton v. Reagan & Gee,* 405 S.W.2d 828, 837 (Tex. Civ. App. 1966) (wherein the court recognized that a new stockholder's unsuccessful efforts to save a dying corporation did not justify disregarding the corporate entity). Nor is this a case where Olson induced Truckweld to deal with Aztec by representing that he would infuse the company with further capital. *Soderberg Advertising, Inc. v. Kent–Moore Corp., supra.* Again, the evidence supports the trial

---

[3]Truckweld Equipment Company, Inc., argues that the original capital contribution of only $500 manifests a fraudulent intent in the incorporation and acquisition of Aztec Enterprises, Inc. In this regard we find it significant that the Washington Business Corporation Act, RCW Title 23A, no longer requires a minimum capitalization of $500 as RCW 23A.12.050 once did.

[4]In most cases, the allegation of inadequate capitalization should be examined only as further evidence of an underlying fraud. The very nature of a piercing the corporate veil case means that the corporation lacks sufficient capital to satisfy the creditor's claim.

court's finding that, because of his reliance on Burns, Olson was not aware of the dire straits into which the corporation had fallen until Burns left the company.

The law provides adequate safeguards with which Truckweld could have protected its interests in light of what it knew about Aztec and Olson. Yet, Truckweld made no effort to obtain Olson's personal guaranty prior to extending credit nor did it file timely chattel liens when Aztec's payment became questionable. It was Truckweld's failure to utilize these safeguards which contributed to its loss, not any misconduct or abuse of the corporate form by Olson. *See Culinary Workers & Bartenders Union Local 596 v. Gateway Cafe, Inc.,* 91 Wn.2d 353, 588 P.2d 1334 (1979); *Soderberg Advertising, Inc. v. Kent–Moore Corp., supra;* Notes, *Disregard of the Corporate Entity,* 4 Wm. Mitchell L. Rev. 333 (1978).

Truckweld next argues that Olson was unjustly enriched by the modifications it made to Olson's trucks. Unjust enrichment, or quantum meruit, is a contract implied at law requiring a party to make restitution to the extent he has been unjustly enriched. *Bill v. Gattavara,* 34 Wn.2d 645, 209 P.2d 457 (1949). Not only must the party be enriched but the enrichment must be unjust.

> The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor.

Restatement of Restitution, ch. 1, § 1, comment *c* (1937). Although Olson leased several of the modified trucks to Aztec, the trucks were sold and the proceeds applied toward satisfaction of either prior security interests on the vehicles or the Bank's loan to Aztec. Although Aztec was relieved of its debt we do not find Olson to have been unjustly enriched. The Bank held a security interest in the trucks superior to that of Truckweld, thereby relegating Truckweld to the position of a subordinate creditor. There is no injustice in the Bank's receipt of the proceeds from its collateral.

Finally, Truckweld argues that Aztec was the agent of Olson and that Olson personally ratified the contract between Truckweld and Aztec by acknowledging its binding effect and accepting the benefits of performance. We find this argument to be without factual support. *Barnes v. Treece,* 15 Wn. App. 437, 549 P.2d 1152 (1976), cited as authority by Truckweld, concerns ratification of a contract made by an agent acting in excess of his authority. Truckweld points to no evidence indicating that Olson made Aztec his agent for personal business. Aztec's contract with Truckweld was formed by Aztec's agent for the benefit of Aztec.

Olson cross–appeals by raising three claims for relief which the trial court rejected: conversion, abuse of process, and an award of costs under CR 68.

■ We agree with the trial court's finding that Olson's offering of a personal check in exchange for delivery of the last modified truck was an inadequate tender of payment. The personal check was not a sufficient tender, especially in light of Truckweld's awareness of Aztec's financial troubles.

■ Next Olson argues that Truckweld's filing of chattel liens beyond the statutory 60–day period constitutes an abuse of process. However, no error has been assigned to the trial court's finding that Olson was not damaged by the liens filed. The issue is moot. *See* Restatement (Second) of Torts § 682 (1977).

Lastly, Olson directly challenges the holding of *Sims v. KIRO, Inc.,* 20 Wn. App. 229, 580 P.2d 642 (1978), *cert. denied,* 441 U.S. 945, 60 L. Ed. 2d 1047, 99 S. Ct. 2164 (1979), which holds that one making an offer of judgment pursuant to CR 68 may recover only statutory "costs," and not attorney's fees and expert witness fees. RCW 4.84.030–.080. *See also Jordan v. Berkey,* 26 Wn. App. 242, 611 P.2d 1382 (1980). Olson, however, cites no relevant authority for such a revised rule.

The trial court is hereby affirmed as to all issues raised.

PEARSON and PETRICH, JJ., concur.