Nicholas P.S. BALDWIN, et
al., Plaintiffs,

v.

MATTHEW R. WHITE INVESTMENTS,
INC., a Utah corp., et al., Defendants.

No. 84–C–0486S.

United States District Court,
D. Utah, C.D.

July 8, 1987.

Christopher L. Burton, Janet C. Graham, Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah, for plaintiffs.

R. Brent Stephens, Andrew M. Morse, Robert C. Keller, Snow, Christensen & Martineau, Salt Lake City, Utah, for Matthew R. White Investments, Inc., and Matthew R. White.

John Paul, pro se.

RULING AND ORDER

SAM, District Judge.

This action is before the court on the plaintiffs' motion to impose liability on defendant Matthew R. White, individually, for the verdict rendered against defendant John Paul, an employee of Matthew R. White, Inc.

I. *The parties*

Plaintiffs Nicholas Baldwin (Baldwin) and Leslie Gail Baldwin are British Citizens residing in London, England. Plaintiff Harrison Baldwin is a British corporation with its principal place of business located in London, England. For purposes of this opinion, the plaintiffs will be denominated the "Baldwins."

Defendant Matthew R. White Investments, Inc. (MWI) is a Utah corporation with its principal place of business located in Salt Lake City, Utah, and is a registered broker-dealer engaged in the purchase, sale and promotion of securities and investments on behalf of the general public.

Defendant Matthew R. White (White), a citizen of the State of Utah, is the founder and president of MWI.

Defendant John Paul, at all relevant times a citizen of the State of Utah, pur-

chased and sold securities on behalf of MWI.

## II. *Factual background*

The Baldwins maintained a securities trading account with MWI from June, 1983 through approximately December, 1983. In August, 1983, MWI had obtained the exclusive right to sell 1,950,000 shares of Games Network common stock at an opening price of $2.00 per share from which MWI was to receive a sales commission of 12%. Paul's secretary called Baldwin, and recommended he purchase Games Network stock at the new issue price of between $5.00 and $6.00 per share. At the time of the call, the actual new issue price was $2.00 per share.

Baldwin agreed to purchase a total of 15,000 shares of Games Network at 12,000 shares for $5.375 per share and 3,000 shares for $5.50 per share, and requested a Games Network prospectus. Two months after the transaction, Baldwin received the prospectus, and discovered the new issue price for the stock was $2.00 per share, not $5.375 as Paul represented to him. Baldwin telephoned Paul, but received no explanation for the discrepancy. Baldwin then ordered Paul to sell his total holdings at the price quoted to him of $3.62/$.00 per share, to which Paul replied he could only sell 2,000 shares at $3.62 a share. By the time the remaining shares were sold, the price had fallen to $3.50/$3.75. On December 8, 1983, Baldwin notified MWI he wished to rescind the sale of the 15,000 shares in Games, and MWI rejected the offer. There is currently no market for Games Network.

The evidence at trial establishes that White knew nothing of the transaction between Baldwin and Paul until several months after it occurred.

On June 4, 1984, the Baldwins brought this lawsuit alleging violations of the Federal Securities laws, common law fraud and negligence. In February, 1985, MWI commenced to self-liquidate, and by May, 1985, had ceased doing business. The Baldwins then amended their complaint to request the court to hold White personally liable on the theory that MWI was the alter ego of White. For purposes of trial, the issues of Paul's liability and corporate disregard were severed.

On January 26, 1987, the Baldwins received a jury verdict against Paul for negligence; negligent misrepresentation; violation of section 12(2) of the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.;* violation of section 22(1)(b) of the Utah Uniform Securities Act, Utah Code Ann. § 61–1–22(1)(b); and punitive damages. They now seek to disregard the corporation and recover against White individually, on the grounds that: 1) MWI should be disregarded because it fails to meet the criteria for limiting shareholder liability; 2) White, as Paul's employer, is a "controlling person" under 15 U.S.C. § 77o; and 3) White is a principal for John Paul, and thus liable for Paul's acts under a *respondeat superior* theory. Concerning the controlling person and *respondeat superior* claims, the court agrees with White that where those theories were not advanced in the Baldwins' amended complaint,[*] they are not before the court.

## III. *The doctrine of corporate disregard*

It is noted at the outset that courts are generally reluctant to pierce the corporate veil. *See e.g., Hickman v. Rawls,* 638 S.W.2d 100, 102 (Texas Ct.App.1982) ("The general rule is that a corporate entity may not be ignored. An exception ... exists only under the most extraordinary circumstances where the corporate entity is used to perpetrate a fraud against the public or against public policy or to circumvent a statute or to protect a crime."). In *Dockstader v. Walker,* 510 P.2d 526, 528 (Utah 1973), the Utah Supreme Court underscored the need for proceeding with caution when setting aside the well-settled princi-

---

[*] In the Baldwins' complaint, White was not named individually, and only MWI was charged under the controlling person or *respondeat superior* theories of liability. In their amended complaint, the Baldwins named White individually; however, they did not alter their Fourth Claim for Relief related to controlling persons and *respondeat superior.*

ples of shareholders' limited liability, by stating:

> The doctrine [of corporate disregard] generally applies to situations known as 'one-man corporations,' i.e., where one man owns practically all of the stock either directly or through others who hold it for his use and benefit, and where the stockholder uses the corporation as a shield to protect him from debts or wrongdoings. It cannot be applied to make a stockholder liable for the legitimate debts of a corporation unless he is so closely allied with the corporation through ownership and management as to enable the courts to see clearly that the corporation is but a sham and it is the stockholder who is doing business behind the corporate shield.

The Baldwins maintain MWI is essentially a "one-man corporation" because White and his wife, Jill, owned 100 percent of the stock in MWI, certain corporate formalities were not observed and White was so closely allied with MWI as to make it a sham. They further assert that, under the two-prong test set out in *Norman v. Murray First Thrift & Loan Co.,* 596 P.2d 1028 (Utah 1979), the corporate entity of MWI must be disregarded on the following grounds: 1) there is such a unity of interest and ownership that the separate personalities of MWI and White no longer exist; and 2) the observance of MWI would sanction a fraud, promote injustice or an inequitable result. *Messick v. P.H.D. Trucking Service,* 678 P.2d 791 (Utah 1984) (Adopted *Norman* test).

The Utah authorities cited above center on two questions: A) whether the corporate formalities observed in the formation and management of MWI were sufficient to overcome the charge it was merely the White's alter ego; and B) whether failure to disregard MWI would lead to an improper or inequitable result by which the Baldwins may be effectively barred from recovery of their judgment against Paul.

### A. *Corporate formalities*

■ After review of the evidence concerning the corporate formalities observed in the organization and direction of MWI, the court is persuaded the corporation was neither merely a "sham," nor was there such a unity of interests and ownership that the separate personalities of White and MWI no longer exist. The undisputed evidence shows the following formalities and other indicia of legitimacy present during the four-year period in which MWI operated:

1. MWI's Articles of Incorporation comport with Utah statute, Utah Code Ann. §§ 16–10–1 *et seq.* (1953), by
   a) adopting by-laws that were properly executed by the directors and secretary;
   b) registering an agent in the state;
   c) issuing certificates representing its stock shares;
   d) holding two annual meetings;
   e) filing two annual reports; and
   f) being managed by a Board of Directors comprised of President, White; Financial Comptroller, Toy Whitney; and Secretary, Jill White;
2. MWI was regulated by the Securities Exchange Commission;
3. MWI remained properly capitalized in compliance with N.A.S.D. capital reserve;
4. White avoided commingling of funds by maintaining separate bank accounts;
5. MWI was formed with the assistance of counsel;
6. MWI was licensed to do business in 13 other states;
7. Fifteen to twenty brokers worked in the office; and
8. MWI paid state and federal income taxes for 1981 through 1984, its years of operation.

■ The Baldwins counter that Jill White demonstrated in her deposition she knew very little about MWI or the securities business in general. Apparently, she never attended a board meeting or kept minutes, and, in their affidavits, certain employees attest they never heard mention of a board meeting. The court notes, however, the mere absence of certain formalities is insufficient to disregard a corporate

form. *Contractors Heating & Supply Co. Scherb*, 163 Colo. 584, 432 P.2d 237, 239 (1967) ("Standing alone, informalities in the conduce of a corporate business do not form a basis for piercing the corporate veil[;] ... the corporate form ... will not be disregarded unless it was used to perpetrate a fraud or defeat a rightful claim."). Here, most of the corporate formalities were observed, and no evidence supports a claim that Baldwin was harmed by any of the alleged informalities. Where Paul acted without White's knowledge, the same result would have obtained had all corporate formalities been in place. Therefore, the court concludes Baldwin failed to meet his burden under the first prong of the *Norman* test.

### B. *Fraud, injustice or inequitable result*

■ Under the second prong of the *Norman* test, the Baldwins must show that recognition of MWI would sanction a fraud, promote injustice or lead to an inequitable result. They assert the requisite fraud, injustice or inequity would follow from White's escaping liability for the acts of Paul by self-liquidating MWI after this action was commenced, when MWI received $695,000 in commissions on the sale of the Games Network stock. The Baldwins rely on *Chatterly v. Omnico, Inc.* for the proposition that individuals or entities permitted to manage and operate a business wherein they stand to gain whatever profit may be made should not then be permitted to stand behind the corporate shell and be insulated from corporate liabilities. 26 Utah 2d 88, 485 P.2d 667, 670 (1971). However, the Baldwins fail to recognize that the *Chatterly* defendant reaped all the benefits of operating a certain business, then used the nomenclature of another corporation as a facade to insulate it from responsibility for paying for services to the underlying business. Such deceit in the inception and purpose of a corporation meets the *Norman* burden for showing fraud, injustice or inequity. Indeed, the *Chatterly* Court stated, "Some element of unfairness, something akin to fraud or deception, must be present in order to dis-

regard the corporate fiction." *Id.* As this court determined above, MWI was organized and operated as a legitimate brokerage firm, and there exists not a shard of evidence to the contrary.

■ Simply put, the Baldwins are saying that where it is unlikely they will be able to collect their judgment against Paul, and MWI no longer exists, it is not fair they should be prohibited from seeking recovery against White personally. On that question, the Tenth Circuit held that a claimant's inability to collect a judgment from a corporation is not enough to show that fraud or inequitable conduct resulted from the use of the corporate structure. *See Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373 (10th Cir.1980). A decision to the contrary would totally eviscerate the doctrine of limited liability for corporate shareholders, and undermine a fundamental protection that encourages business venture. The court is not moved from its position by the Baldwins' argument that MWI showed fraudulent intent by self-liquidating after this law suit was commenced. The uncontroverted evidence at trial showed MWI was terminated upon the advice of White's accountant and legal counsel because the corporation was not cost-effective in its then current form. MWI's creditors were paid in full through the liquidation process, and there is no evidence of impropriety in the procedures followed. That a harm should result from legitimate liquidation is insufficient to show corporate misconduct. *Meisel v. M & N Modern Hydraulics Press Co.*, 97 Wash.2d 403, 645 P.2d 689, 693 (1982). Moreover, the court finds no compelling evidence to persuade it the filing of the instant action was a catalytic factor in the decision to liquidate MWI. Nor is the court disturbed by the fact that sale of the Games Network stock generated $695,000 in commissions for MWI, because Paul's misrepresentation to Baldwin was the sole fraudulent activity asserted in relation to MWI's handling of the stock. In sum, the court finds no reason to disregard the corporate form of MWI on the basis of fraud, injustice or inequitable result.

**1058**

### IV. *Conclusion*

The found facts do not support disregard of the corporate form and imposition of liability against Matthew White individually where MWI was neither formed nor operated for an improper purpose, and White did not authorize or sanction Paul's fraudulent activity. The corporate officers' capacity to limit their liability beyond their capitalization is the crux and nature of the law, *Truckweld Equipment Co. v. Olson,* 26 Wash.App. 638, 618 P.2d 1017 (1980), and the evidence set forth by the Baldwins fails to meet the heavy burdens of proof inherent in the doctrine of corporate disregard.

Accordingly, the plaintiff's motion to disregard the corporate form and impose liability on Matthew White individually is denied.