# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

JACKSON J. MIKA,

                      Appellant,

       v.

JBC ENTERTAINMENT HOLDINGS, INC.,
a corporation doing business in the State of
Washington; JBC OF SEATTLE, WA., INC.,
a Washington business, a subsidiary of JBC
ENTERTAINMENT HOLDINGS, INC., an entity,
GEMINI III LP, owner of JBC ENTERTAIN-
MENT HOLDINGS, INC.,GAMEWORKS
ENTERTAINMENT, LLC, a corporation doing
business in the State of Washington;
MARQUIS HOLMES, an individual, dba
BOSS LIFE ENTERTAINMENT, JANE DOE,
and wife, and their community; TONY
HUMPHREYS, an individual, husband
and wife and their community,

                    Respondents.

No. 73305-2-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: August 29, 2016

SPEARMAN, J. — Jackson Mika appeals the trial court's orders granting summary judgment in favor of Gemini Investors III, LP (Gemini), GameWorks Entertainment, LLC (GameWorks), and Tony Humphreys. Mika contends that issues of material fact exist as to whether Gemini fraudulently transferred assets to GameWorks to avoid liability on his personal injury claim, and whether

Humphreys should be held personally liable for his injuries. We conclude the trial court did not err and affirm.

## FACTS

On March 20, 2010, Jackson Mika was at Jillian's Billiard Club (Jillian's), a nightclub in Seattle's south Lake Union neighborhood, which was hosting a promotional event featuring hip-hop artist, Lloyd. Mika was standing at the bar when he heard gunshots. As he ran out of the club, Mika was struck by a bullet that entered his right buttock and exited from his groin area. He sustained a number of internal injuries and required extensive surgeries and rehabilitative care.

In March 2010, Jillian's was owned by JBC of Seattle, WA, Inc. (JBC of Seattle), which in turn was owned by JBC Entertainment. Respondent JBC Holdings was the sole shareholder of JBC Entertainment. The shareholders of JBC Holdings were Gemini, Greg Stevens, and Alpha.

Tony Humphreys was a regional manager for JBC Entertainment, overseeing the operations of six different restaurants in various states, including the Jillian's in Seattle. In early March 2010, he met with Jillian's management team, including Michael Knudsen, the assistant unit manager. At that meeting, Humphreys specifically instructed that no promotions were to be held at the club during Humphreys' upcoming vacation. Humphreys' duties typically did not include day-to-day management and operation of the restaurants, but at that time, he was taking a more "hands on" approach with the Seattle Jillian's because the

general manager was out and the assistant general manager, Chris Young, was in charge.

During Humphreys' vacation, Knudsen was approached by Marquis Holmes about holding a promotional party at Jillian's. Despite Humphreys' instructions, Knudsen agreed to hold the event at Jillian's on March 20, 2010. He did not contact Humphreys for approval. Humphreys learned about the event on March 17, 2010 from Katie Benjamin, the event sales manager, when she called him to discuss the promotion.[1] Humphreys told her that the promotion was not to proceed and directed her to advise Knudsen. When Humphreys learned that the promotion had taken place in spite of his instructions, he terminated Knudsen and Benjamin for insubordination.

On the night of the shooting, Jillian's employed door hosts to greet guests and screen for age requirements. But it did not have employees dedicated to providing security for the club. According to JBC Entertainment's chief operating officer, Tyler Warfield, the on-site management, would have been the "first line" for patron safety at the Seattle location. Greg Stevens, JBC Entertainment's, chief executive and chief financial officer (CEO/CFO), agreed that the general manager and his team were primarily responsible for the overall safety and security of both the employees and guests. On the day of the shooting, the on-site management team included Knudsen and Young. It appears undisputed that Knudsen had not

---

[1] It is unclear from the record whether Benjamin was at the meeting when Humphreys initially forbid any promotions while he was on vacation.

3

received training on what measures to take if a violent situation, such as a shooting, were to occur in the club. However, Knudsen testified that he had arranged for some additional security guards to be on staff the evening of the promotion.[2]

In addition, Humphreys testified that JBC Entertainment had an employee at its Louisville office who was responsible for compliance with all local ordinances, including those such as Seattle Municipal Code (SMC) 10.11. That ordinance required nightclubs to develop and file a safety plan with the city. It is undisputed that Jillian's was not in compliance with the ordinance on the evening that Mika was shot.

<u>The Sale of JBC Holdings</u>

In 2004, Gemini and other investors purchased certain "Jillian's Billiards Clubs" assets out of bankruptcy through the entity JBC Holdings. Initially there were twenty Jillian's Billiard Clubs in several states, operated by the wholly owned entity JBC Entertainment. But by 2011, only seven remained in operation. Some of clubs were sold, but others were closed due to financial difficulties. During the first two years of being acquired, various clubs underperformed, requiring JBC Entertainment to seek additional capital to keep them running. JBC Entertainment obtained short-term loans from third parties, secured by liens on the Jillian's businesses and by cash collateral provided by investors.

---

[2] At his deposition, Knudsen testified that on March 20, 2010 another employee, Brock Robinson, was ultimately responsible for security.

The effort to sustain operations was unsuccessful and the establishments continued to underperform. JBC Entertainment was in default on its obligations to its secured lenders, GE Capital and Fifth Third Bank, for approximately $4.6 million dollars. The GE Capital loan was in default and no payments had been made for over a year. In early 2011, GE Capital began pressuring JBC Entertainment to make payments or provide additional credit support from the investor group.

On May 20, 2011, respondent GameWorks communicated with Gemini and Stevens about possibly purchasing JBC Entertainment's assets. On July 8, 2011, GameWorks sent a letter of intent to Gemini and Stevens. On October 18, 2011, GameWorks Acquisitions, LLC (GW Acquisitions), an entity created specifically for this purchase, entered into an Asset Purchase and Sale Agreement (APSA) with JBC Entertainment and some of its subsidiaries. GW Acquisitions, as the sole buyer, purchased five of the remaining seven JBC Entertainment establishments-- one located in Seattle, one in Virginia, and three in California. All of JBC Entertainments' assets were subject to the creditors' liens, with outstanding secured debt of approximately $6 million.

The parties negotiated separate purchase prices for each location. GW Acquisitions paid $500,000 for the Seattle Jillian's because it was not profitable, in need of renovation, and surrounded by city construction. The total sale price for all five locations was approximately $3 million. In addition, because the APSA specifically excluded liability for, among other things, encumbrances on the

purchased assets, GW Acquisitions required Gemini to obtain a release from the secured lenders. Gemini also agreed to hold GW Acquisitions harmless from any other excluded liabilities. Mika's claim for personal injury, listed as a potential liability on Schedule 2.4 to the APSA, was an excluded liability.

GE Capital accepted a modest discount and was paid $1,442,580.76 in sale proceeds to release its lien on the assets sold to GW Acquisitions. The remaining proceeds went toward the $3.6 million owed to Fifth Third Bank. Fifth Third Bank used the cash collateral posted by Gemini, Stevens, and Alpha to satisfy the remaining balance and released its lien. JBC Entertainment retained approximately $50,000 of the sale proceeds to finish its affairs.

Procedural History

On January 5, 2011, Mika brought an action for personal injury against defendants JBC Entertainment Holdings, Inc. (JBC Holdings), Gemini Investors III, L.P (Gemini) and Alpha Capital Partners, Ltd. (Alpha), as owners of JBC Holdings, Michael B. Knudsen, and Marquis Holmes, d/b/a Boss Life Entertainment. Mika alleged that his injuries were caused by the negligent failure of the defendants to take reasonable security measures. Mika also claimed the defendants were liable for negligent hiring, negligent supervision, and improper instruction and training.[3] On July 1, 2011, Gemini's and Alpha's motions to dismiss Mika's claims were granted based on lack of personal jurisdiction.

---

[3] Mika also asserted claims against Stevens, Humphreys and Holmes for outrage and infliction of emotional distress.

6

On February 15, 2012, Mika filed an amended complaint adding Greg Stevens, Tony Humphreys, and GameWorks as defendants. Mika also renewed his claims against Gemini. Mika's claims against GameWorks and his renewed claims against Gemini alleged that the sale of JBC Entertainment's assets (including Jillian's in Seattle), GameWorks was in violation of the Uniform Fraudulent Transfer Act (UFTA), chapter 19.40 RCW.[4]

The trial court granted Gemini's and GameWorks' motions for summary judgment and dismissed Mika's claims against them on February 11 and 15, 2013, respectively. The court also granted Humphreys' motion for summary judgment and dismissed Mika's claims against him on October 13, 2014.[5] Mika appeals these rulings.[6]

## DISCUSSION

A defendant is entitled to summary judgment when he or she can show an absence of evidence supporting an element essential to the plaintiff's claim. Young v. Key Pharmaceuticals, Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). A defendant is merely required to challenge the sufficiency of the plaintiff's evidence on any material issue. Id. The burden then shifts to the nonmoving party to set

---

[4] In a second amended complaint filed on November 30, 2012, Mika explicitly claimed that GameWorks was liable "because of the fraudulent conveyance by the predecessor owners, Gemini." Clerk's Papers (CP) at 188.

[5] The trial court's denial of Stevens' motion for summary judgment based on lack of personal jurisdiction was reversed on appeal. Mika v. Stevens, 2013 WL 6835257, 178 Wn. App. 1030 (2013). Mika's claims against Stevens were dismissed on June 23, 2014. He is not a party to this appeal.

[6] After entry of these orders, the court granted Mika's motion to voluntarily dismiss his remaining claims without prejudice.

forth specific facts by affidavit or other evidence that show a genuine issue exists. Ingersoll v. DeBartolo, Inc., 123 Wn.2d 649, 654, 869 P.2d 1014 (1994). The nonmoving party may not rely on the allegations in the pleadings, and any affidavits submitted must be admissible, based on personal knowledge, and not merely conclusive, speculative or argumentative. Grimwood v. University of Puget Sound, Inc., 110 Wn.2d 355, 359, 753 P.2d 517 (1988).

Mika argues that Gemini is liable under the Uniform Fraudulent Transfer Act (UFTA) for transferring JBC Entertainment's assets to GameWorks, making JBC Entertainment insolvent and denying Mika the ability to obtain full redress. Gemini argues that the transfer was not fraudulent under the UPTA because the assets sold were subject to a valid security interest.[7]

Under RCW 19.40.041(a), a transfer made by a debtor is fraudulent to a creditor, if the property was transferred "(1) [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) Intended to incur, or believed or reasonably should

---

[7] Gemini also argues that the transfer was not fraudulent because sale occurred after Mika's claims against Gemini had been dismissed and because JBC Entertainment had never been named as a party to this litigation. In light of our disposition of the case, we do not address these issues. We note, however, there is some dispute as to whether JBC Holdings and JBC Entertainment are separate and distinct. The record contains a certificate of amendment from the Secretary of State of Delaware showing JBC Entertainment Holdings, Inc., changed its name to JBC Entertainment, Inc., on October 27, 2004.

have believed that he or she would incur, debts beyond his or her ability to pay as they became due." RCW 19.40.041(a).

A fraudulent transfer occurs where "one entity transfers an asset to another entity, with the effect of placing the asset out of the reach of a creditor, with either the intent to delay or hinder the creditor or with the effect of insolvency on the part of the transferring entity." Thompson v. Hanson, 168 Wn.2d 738, 744, 239 P.3d 537 (2009). Any party making a claim under the UFTA carries the burden of proving that the transfer in question was fraudulent. Sedwick v. Gwinn, 73 Wn. App. 879, 885, 873 P.2d 528 (1994). Proof of actual intent to defraud must be clear and satisfactory.[8] Clearwater v. Skyline Const. Co., Inc., 67 Wn. App. 305, 321, 835 P.2d 257 (1992).

Under RCW 19.40.011(2)(i), an "asset" means property of a debtor, but does not include "[p]roperty to the extent it is encumbered by a valid lien." A "lien" under the statute is "a charge against or an interest in property to secure payment

---

[8] When determining actual intent under the statute, consideration is given to a number of non-exclusive factors, including whether:
  (1) The transfer or obligation was to an insider;
  (2) The debtor retained possession or control of the property transferred after the transfer;
  (3) The transfer or obligation was disclosed or concealed;
  (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
  (5) The transfer was of substantially all of the debtor's assets;
  (6) The debtor absconded;
  (7) The debtor removed or concealed assets;
  (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
  (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
  (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
  (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
RCW 19.40.041(b).

of a debt or performance of an obligation, and includes a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common-law lien, or a statutory lien. RCW 19.40.011(8). A "valid lien" means "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." RCW 19.40.011(13).

The record shows that at the time of the transfer, all of JBC Entertainment's assets were subject to GE Capital and Fifth Third Bank's secured liens. These liens would have been effective against any judgment Mika might have obtained. Accordingly, we conclude that Mika's claim for fraudulent transfer was properly dismissed on summary judgment because none of the purchased properties were "assets" as that term is defined in the UFTA.

Mika raises a number of arguments that, according to him, give rise to the inference that a fraudulent transfer occurred. Mika argues that Gemini exhibited "actual intent" to hinder, delay, and/or defraud him after JBC's motion for summary judgment was denied. He also argues that GameWorks is liable for constructive fraudulent transfer because after it purchased JBC Entertainment's assets, only a shell of JBC Entertainment remained. Mika also argues that GameWorks is liable as a successor, because it took assets in bad faith and with actual and constructive knowledge of a fraudulent transfer, and because it is a mere continuation of JBC Entertainment. None of these arguments raise an issue

of fact with regard to GameWorks' liability for fraudulent transfer, because none of the transferred property falls within the statute's definition of "assets."

Mika next argues that the "collusion of Gemini and GameWorks" requires the court to pierce the corporate veil and hold both companies liable for his injuries. Br. of Appellant at 25. He argues that "the abuse of the corporate form was blatant, obvious, intentional, and would result in manifest loss" to himself. Id.

"[T]he doctrine of disregarding the corporate entity is an equitable remedy and will be imposed only in exceptional cases to prevent fraud or manifest injustice." Uni-Com Northwest, Ltd. v. Argus Publ'g Co., 47 Wn. App. 787, 798, 737 P.2d 304 (1987). The Washington Supreme Court has outlined a two-factor test for establishing a claim for corporate disregard: "(1) the corporate form must be intentionally used to violate or evade a duty; and (2) disregard must be necessary and required to prevent unjustified loss to the injured party." Meisel v. M&N Modern Hydraulic Press Co., 97 Wn.2d 403, 410, 645 P.2d 689 (1982) (quoting Morgan v. Burks, 93 Wn.2d 580, 587, 611 P.2d 751 (1980)). "'Mere common ownership of stock, the same officers, employees, etc., does not justify disregarding the separate corporate identities unless a fraud is being worked upon a third person.'" Minton v. Ralston Purina, Co., 146 Wn.2d 385, 399, 47 P.3d 556 (2002) (quoting Rena-Ware Distributors, Inc. v. State, 77 Wn.2d 514, 518, 463 P.2d 622 (1970)).

In disregarding the corporate form, the court exercises its equitable powers. Truckweld Equip. Co., Inc. v. Olson, 26 Wn. App. 638, 643, 618 P.2d

11

1017 (1980); see also Thomas V. Harris, Washington's Doctrine of Corporate Disregard, 56 WASH. L. REV. at 253, 263 (1981). We review the facts underlying corporate disregard for substantial evidence. Truckweld, 26 Wn. App. at 643. But we review de novo the legal conclusions drawn to support corporate disregard. Harris, 56 WASH. L. REV. at 271–75.

Mika cites only the "post-tort" activities of Gemini and GameWorks as the basis for his corporate disregard claim. Br. of Appellant at 23-24. He argues that the transfer was fraudulent and in bad faith, because Gemini and GameWorks feigned innocent and legitimate business reasons for selling the assets with knowledge of Mika's claim. Id.

With regard to the first element of the test, the court must find an abuse of the corporate form. Meisel, 97 Wn.2d at 410. Such abuse typically involves "'fraud, misrepresentation, or some form of manipulation of the corporation to the stockholder's benefit and creditor's detriment.'" Id. (quoting Truckwell, 26 Wn. App. at 645). Mika has not shown any abuse of the corporate form, but even if he had, he must still show that the abuse was used to violate or evade a duty. The record contains ample evidence that JBC Entertainment was in default of its obligations to its secured lenders. The company sold its remaining assets and forfeited its collateral in order to pay down its debts.

Even if Gemini and GameWorks had abused the corporate form, Mika's claim still fails because he cannot prove that piercing the veil will "'prevent an unjustified loss to [him].'" Id. The transfer has no impact on Mika's ability to

recover, because he would not have been able to collect on a judgment against JBC Entertainment.

Because Mika has not shown the existence of material disputed facts as to whether there is a basis for piecing the corporate veil of either Gemini or GameWorks, the trial court properly dismissed these claims.

Mika argues that Humphreys should be personally liable for his injuries under "Responsible Corporate Officer Doctrine." Br. of Appellant at 40. If a corporate officer participates in the wrongful conduct, or knowingly approves of the conduct, then the officer, as well as the corporation, is liable for the penalties. State v. Ralph Williams' North West Chrysler Plymouth, Inc., 87 Wn.2d 298, 322, 553 P.2d 423 (1976). But the argument fails because the record clearly shows that Humphreys was an employee of JBC Entertainment. There is no evidence that he was ever a corporate officer or held a seat on the board of directors of Jillian's or JBC Entertainment.

Mika also argues that Humphreys is personally liable per se because he failed to develop, file, or direct the filing of a safety plan for Jillian's, as required by SMC 10.11.015. And he contends that Humphreys is liable for creating an unreasonable risk of harm when he failed to put in security measures such as purse searches and metal detecting wands before entry and on a proximate cause theory, because a shooting was a foreseeable occurrence. According to Mika, Humphreys had a duty to him as an invitee to take reasonable steps to protect him from imminent and reasonably foreseeable harm.

But the undisputed evidence shows that Humphreys' role as regional manager did not include supervising staff or developing safety and security procedures for the individual establishments. The record shows that the local management team at each Jillian's establishment had responsibility for on-site security, and that JBC Entertainment had a corporate employee responsible for compliance with local ordinances.

Mika also claims that Humphreys was negligent in hiring and supervising Knudsen. "To prove negligent hiring, the plaintiff must demonstrate that (1) the employer knew or, in the exercise of ordinary care, should have known of the employee's unfitness at the time of the hiring; and (2), the negligently hired employee proximately caused the plaintiff's injury." Ruschner v. ADT, Sec. Systs. Inc., 149 Wn. App. 665, 680, 204 P.3d 271 (2009) (quoting Carlsen v. Wackenhut, 73 Wn. App. 247, 252, 868 P.2d 282 (1994)). Similarly, an employer will not be liable for negligent supervision unless he or she knew, or in the exercise of reasonable care should have known, that the employee presented a risk of danger to others. Niece v. Elmview Group Home, 131 Wn.2d 39, 48-49, 929 P.2d 420 (1997).

Mika argues that the trial court erred in dismissing his claims for negligent hiring and supervision because there are issues of material fact regarding whether Humphrey hired Knudsen or if he was acting as Knudsen's supervisor at the time the incident occurred. But even assuming the truth of these assertions, Mika

14

points to nothing in the record suggesting that Knudsen was a risky hire or that he had a tendency to disregard corporate orders or safety concerns.

The trial court did not err when it dismissed Mika's claims on summary judgment.

Affirmed.

Spearman, J.

WE CONCUR:

Leach, J.

Appelwick, J.